PROVOSTY, J.
The indictment against the accused contains two counts — one, under section 1 of Act No. 40, p. 47, of 1912, charging that:
“They being itinerant and traveling agents engaged in the sale of stock of the North Louisiana Electric Railway Company, a corporation organized under the laws of the state of Louisiana, did sell five shares of stock” of said corporation.
The other count is under section 4 of said statute, and charges that, in order to induce the purchase of said stock, they made false representations. They were tried without a jury, and were convicted and sentenced each to a fine of $50, and their case is before this court on writs of certiorari and prohibition to the trial judge.
By motion to quash, they assailed the validity of said statute on a number of grounds. The said act reads as follows:
“An act levying a license tax on itinerant or traveling agents selling stock and bonds; regulating the sale of such stock and bonds by itinerant or traveling agents or vendors and requiring them to secure a certificate of permission before receiving a license; providing the cost and manner of securing such certificate of permission and license; and providing that bonds and security be given that such stock or bonds are as represented; and providing a penalty for the violation of this act.
“Section 1. Be it enacted by the General Assembly of the state of Louisiana, that every itinerant or traveling agent engaged in the sale of stocks or bonds of any corporation, whether organized, in this state or any state or territory, shall before being permitted to make any *707 such sales, procure from the secretary of state, at a cost of one dollar a written certificate of permission, which shall entitle him to procure from the sheriff of the parish, in which he proposes to engage in such sale, a license to do so, which license is hereby fixed at the sum of five dollars per annum, and any such agent who engages in such sales, before securing such certificate of permission and before payment of such license in each parish in which he operates, shall be deemed guilty of a misdemeanor and punished as hereinafter provided.
“Sec. 2. Be it further enacted, etc., that each and every itinerant or traveling agent so engaged in the sale of such stock or bonds before securing such certificate of permission as -aforesaid, shall file with the • secretary of state a sworn statement giving his name, residence and the name and kind of bonds or stock which he proposes to sell, with the par value thereof, as well as a full statement of the domicile and offices of the corporation whose bonds or stock he proposes to sell, and shall therein declare the market value of such bonds or stock with a brief statement of the property owned by such corporation with its location and any such itinerant or traveling agent who shall make any false statement in said affidavit shall be deemed guilty of perjury and prosecuted as such.
“Sec. 3. Be it further enacted, etc., that each of such itinerant or traveling agents shall before securing such certificate of permission, on procuring of any license or making any sales of stock and bonds as hereinbefore referred to give bond in any sum not less than fifteen thousand dollars filed by the secretary of state, and payable to him which bond shall be furnished by a surety company and approved by the secretary of state and the same shall be conditioned that he will make no false statement, or misrepresentation of facts in making such sales of said stock or bonds, the same to continue in full force for a period of two years from date, and any purchaser of stock or bonds from such agent shall have a right of action on this bond to recover any damages caused by any false statement or misrepresentation made by such agent in the sale of such stock or bonds to be recovered before any court of competent jurisdiction in the parish where the sale is made.
“Sec. 4. Be it further enacted, etc., that any such itinerant or traveling agent engaged in the sale of such stock or bonds who shall make any false statement, false representations, or false promise in order to induce any person to buy such bonds or stock and a purchase is made relying thereon, shall be deemed guilty of misdemeanor and on conviction shall be punished as hereinafter provided.
“Sec. 5. Be it further enacted, etc., that each certificate of permission and license shall designate the name of the company whose bonds or stock are being sold under it, as well as the name of the person to whom it is issued and for each separate company or stocks and bonds represented, a separate bond shall be filed and separate certificate of permission and license obtained, and any agent who shall use or attempt to use any certificate of permission or license for the sale of stock and bonds not designated therein and not issued to him shall be deemed guilty of a misdemeanor and shall be punished as hereinafter provided.
“Sec. 6. Be it further enacted, etc., that any itinerant or traveling agent as aforesaid, violating the provisions of this act shall be deemed guilty of a misdemeanor and on conviction thereof shall be fined not more than $500.00 or imprisoned not more than six months or both at the discretion of the court.”
[1] A question which is more or less involved in several of the grounds of nullity urged against this statute, and which might as well be disposed of now and for all, is whether the license imposed by this statute is levied by an exercise of the taxation power or of the police power.
When a license is required to be obtained for the privilege of carrying on some particular business without any payment being required for obtaining it, the governmental power that is being exercised in the premises cannot possibly be that of taxation, but is necessarily that of police, for the necessary function of the taxation power is to procure revenue. When a payment is required for obtaining the license, the power that is being exercised may be either' that of taxation or that of police. If only an amount sufficient to cover the cost of issuing the license is demanded, the power that is. being exercised is still plainly that of police. But, if the amount demanded exceeds the cost of issuing the license, the problem becomes more complicated; especially if, as in the present case, this excess is very large, and the cost of obtaining the license is otherwise provided for.
In nearly all of the very numerous cases where the courts have had to consider this distinction between a license levied under taxation power and one levied under the police power, the question has come up in connection with the ordinance of some municipality that possessed the power to regulate, but not that to tax, the particular business upon which the license was imposed. *709 Hence we generally find the law in that regard stated in the text-books from the standppint of a municipality, not from that of the Legislature. The question cannot possibly arise in an instance where the acting governmental authority possesses both the power of taxation and that of police, for the license is then valid, even if its purpose be to procure revenue to defray the general expenses of the government, ihis accounts for its having so seldom arisen in connection with a license imposed by a Legislature; for Legislatures, as a rule, possess both of the said powers in plenitude.
That law on this point is nowhere more fully and lucidly stated than by Judge Gooley in his work on Taxation (page 589), where he says:
“A fee for the license may still be exacted, but it must be such a fee only as will legitimately assist in the regulation; and it should not exceed the necessary or probable expense of issuing the license and of inspecting and regulating the business which it covers. If the state intends to give broader authority, it is a reasonable inference that it will do so in unequivocal terms. But the limitation of the license fee to the necessary expenses will still leave a considerable field for the exercise of discretion where the amount of the fee is to be determined. The fee, of course, must be prescribed in advance, and when it cannot be determined with any accuracy what the cost of regulation is to be. It must therefore be based upon the estimates with more or less probability that the result will fail to come anything' near a verification of the calculations. Moreover, in fixing upon the fee, it is prnner and reasonable to take into account, not the expense merely of direct regulation, but all the incidental consequences that may be likely to subject the public to cost in consequence of the business licensed. In some cases the incidental consequences are much the most important, and, indeed, are what are principally had in view when the fee is decided upon. The regulation of the business of huckster, for instance, could seldom be troublesome or expensive, but that of the manufacture and sale of intoxicating drinks could not be measured by anything like the same standard. The business is one that affects the public interest in many ways, and leads to many disorders. It has a powerful tendency to increase pauperism and crime. It renders a large force of peace officers essential, and it adds to the expenses of the courts, and of nearly all branches of civil administration. It cannot be questioned, therefore, if it is to be licensed by the public authorities, that it is legitimate and proper to take into the account all the probable consequences, or that the payment to be exacted should be sufficient to cover all the incidental expenses to which the public are likely to be put by means of the business being carried on. And all reasonable intendments must favor the fairness and justice of a fee thus fixed; it will hot be held excessive unless it is manifestly something more than a fee or regulation.”
The cases on this point are very fully and accurately classified in the note in 2 Ann. Cas. 314, where the doctrine of those bearing directly upon the distinction between a license levied under the taxation power and one levied under the police power is summarized thus:
“Under the power to regulate, or to regulate and license, the city may exact the payment of a fee to cover the cost of the license and of the supervision of the business regulated.
“The requirement of such a fee will not be held invalid on the ground that the city incidentally derives revenue therefrom, unless the fee is clearly excessive for the purpose of regulation.
“A license fee may be imposed either for regulation or for revenue, where the city has the power to license, regulate, and tax.”
See, also, under the heading “Limit of Amount of License,” in 30 L. R. A. 415, a very elaborate and very satisfactory monograph, where apparently the effort has been made to give in analytical order the substance of all the decisions upon the subject of licenses as taxation, and as merely regulation.
The general conclusion from the decisions on this subject is given by Judge Dillon, in his work on Municipal Corporations (section 768 [609]), as follows:
“The taxing power is to be distinguished from the police power. * * * The power to license and regulate particular brandies of business or matters is usually a police power; but, when license fees or exactions are plainly imposed for the sole or main purpose of revenue, they are, in effect, taxes.”
Among our own decisions we find cases where market fees, and fees imposed upon private butcher stands, and upon market wagons, have been held to be taxes, because *711 not imposed for mere regulation, but for revenue (Mestayer v. Corrige, 38 La. Ann. 711; Delcambre v. Clere, 34 La. Ann. 1050; State v. Blaser, 36 La. Ann. 365); while, on tbe other hand, inspection fees have been upheld as merely regulative (City v. Hop Lee, 104 La. 601, 29 South. 214; Board of Health v. Standard Oil Co., 107 La. 713, 31 South. 1015).
Accepting the foregoing statements of what the law is on this point as being authoritative, we have to consider whether the license we are dealing with in this case is (in the words of Judge Dillon) “plainly imposed for the sole or main purpose of revenue,” or, in other words, whether it goes beyond providing for the expense of the direct regulation of the business in question, together with that of (to use the expression of Judge Cooley) “all the incidental consequences that may be likely to subject the public to cost in consequence of the business licensed.”
[2] In entering upon the examination of that question, the first thing that strikes us is that the statute does not inform us what use the proceeds of said license are to be put to; in fact, does not inform us whether the said license is to be a state license or a parish license; whether, when collected, it is to go into the parish treasury or the state treasury. Inasmuch, however, as parish licenses are levied by the parish, and state licenses by the state, and this license is levied by the state, no other conclusion is open to us than that it is a state license, whose proceeds must go into the state treasury.
The next thing that strikes us in our investigation of whether this license is levied in-view of, or because of, the expenses to which the public may be subjected in consequence of the adoption of the scheme of regulation embodied in this statute, or just simply as ordinary state revenue, is that we cannot conceive of any possible item of expense that will be entailed upon the state as a consequence of the adoption of said statute. The state is not to be put to one cent of extra expense either in the way of policing said business, or of exercising special supervision over it, or otherwise.
The only possible extra public expenses the adoption of this regulation could possibly entail are those that would be incident to any criminal prosecutions that might be made necessary by violations 'of the statute. But we do not think Judge Cooley could possibly have had reference to an expense such as this when speaking of expenses to which the public might be subjected in consequence of a particular business being licensed. If such an expense as this could be,taken into consideration in determining whether any particular measure was confined to regulation or included revenue, it is easily perceived how substantial revenue-bearing clauses could, under pretext of covering expenses of possible future prosecutions, be added to every ordinance adopted under the naked power to regulate; and three-fourths at least of the cases wherein the question of whether the particular license involved in the case was, or was not, a mere regulative measure, would be consigned at one sweep to the rubbish heap of obsolete jurisprudence. The sanction of a regulative ordinance is usually the denouncement of a penalty. If a license fee to cover the probable cost of probable or possible prosecutions for violations of the ordinance could be incorporated in the regulation as part thereof, the consequence would be that a very substantial amount of revenue could be derived in every case under authority given to simply regulate. .A pretty thorough examination of the decisions has revealed to us no case where the probable cost of possible future prosecutions for the violation of a regulative ordinance has been allowed to be taken into computation in fixing the amount of the license fee proper to be exacted for permis *713 sion to carry on any particular business. Tbe nearest approach we have found to it is the case of St. Paul v. Goiter, 12 Minn. 41 (Gil. 16), 90 Am. Dec. 278, where it was held that it was competent for a city, in fixing the sum required for a license, to look to the probability that the city might be put to expense in litigation and to other expenses arising out of the business licensed.
But, in reality, that point is of hardly any interest in the present case, since the proceeds of the license involved in this case would go to the state, and not to the parish, and hence would not, and could not, be put to the use of defraying the expense of prosecutions. The expenses of all prosecutions are borne by the parishes, and not by the state. The only part thereof borne by the state is the salary of the judges of the district and Supreme Courts and of the district attorney. This judicial expense on the part of the state could not possibly be added to, even in the slightest degree, by the adoption of this statute.
[3] In that connection it is notable that the title of the act starts out with the announcement that the act is “An act levying a license tax.” The fact, however, that this license is there called a tax is not necessarily conclusive of its being, or not, levied by an exercise of the taxation power; for license taxes can be validly levied by an exercise of the police power, subject only to the condition that they be for regulation merely, and not for revenue. Judge Cooley has devoted a chapter of his work on taxation to “Taxes Under the Power of Police.” The nature of any 'measure has to be determined from its operation, and not from the name given to it. The Legislature could not validate as a mere regulation measure a license which in reality was a tax, by simply expressly declaring that it was a mere regulation measure, although its declaration that a certain measure was intended as a tax would perhaps go very far towards being conclusive.
We have to conclude therefore that this license is levied by an exercise of the taxation power; and this brings us to the consideration of the several grounds upon which the accused assail the validity of this statute.
Some of them relate to form, and some to substance.
First, as to those relating to form:
[4] The body of the act is said to be broader than its title, in violation of article 31 of the Constitution, requiring the object of acts to be stated in their titles. <•
What part of the body of this act is thus supposed to be broader than the title is not stated anywhere; not in the pleadings, and not in the argument; and we, for our part, have not been able to discover it.
[5] The act is said to contain two objects, in violation of the same article 31 of the Constitution, requiring acts to have but one object. The two objects are said to be: First, the levying of a tax, namely, the $5 license; and, second, the regulating of the business upon which the statute bears.
From the mere reading of the statute it is evident that its sole object is to regulate the said business, and that the levying of the said license is merely an incident in the scheme of regulation—a mere means of regulation. Indeed, the learned counsel for relators virtually argue in that sense, since they argue that the conditions imposed by said act upon the said business are so burdensome as to be practically prohibitory. A law practically prohibiting the carrying on' of a business can hardly have for its object to derive a revenue from the business being carried on. The taxation power is not infrequently used for purposes of regulation.
[6] Next, it is objected that the license imposed by said act is not graduated, as is re *715 quired by article 229 of the Constitution of taxation licenses.
• We think this license is graduated. The graduation consists in the- agent being required to take out a separate license for each company or stock or bond he represents and for each parish he does business in. This is a graduation. An agent who represents but one company or stock or bond, and does business in but one parish, pays but one license; whereas an agent who represents two or more companies or stocks or bonds, or does busi.ness in tv/o or more parishes, pays as much more in the way of license as this more extended business calls for under the act. While the Constitution requires licenses to be graduated, it leaves the Legislature entirely free as to the mode of graduation. State v. Liverpool, London & Globe Ins. Co., 40 La. Ann. 463, 4 South. 504.
So much for the objections as to form. Now as to those relating to substance:
[7, 8] One is that the conditions imposed by the act are so burdensome ’as to be practically prohibitive, with the result that the itinerant venders are deprived of their liberty and property in violation of the federal Constitution.
The evident object of the' act is to protect the public against the danger of fraud and deception with which the business of selling stocks and bonds by itinerant agents of corporations is supposed to be fraught. Whether this danger is so patent and serious as that it would have justified the Legislature in prohibiting the business altogether, under its police power, is a question we need not go into, as we do not find that this act will have that effect. The argument of learned counsel for showing that it will is that the profit of the agent on the sale of a $50 stock or bond would amount, at most, to $5; whereas the license would cost that much, and the giving of the bond would cost $150 to $300. But no agent would go into the business on the expectation of making a profit of only $5, or even $150 or $300. No evidence has been offered to show that said statute will operate prohibitively. The Legislature has evidently thought it would not, and has acted upon that assumption; and the action of the Legislature is always presumed to be right until the contrary has been clearly shown. In re Spencer, 149 Cal. 396, 86 Pac. 896, 117 Am. St. Rep. 137, 9 Ann. Cas. 1105; 8 Cyc. 801. The license is certainly not excessive; and the exaction of a bond from itinerant vendors is not uncommon. 15 A. & E. E. of L. p. 300; Freund, Police Power, § 40, p. 36.
[9] Another objection is that said statute unlawfully discriminates between itinerant sellers and sellers with fixed places of business, and is therefore class legislation, obnoxious to the provisions of the federal Constitution.
The itinerant vender has always been distinguished in legislation from the vender with fixed place of business, and put in a separate class. He has always been singled out for special supervision and regulation. 15 A. & E. E. 295, 300; 8 Cyc. 875, 1115; 21 Cyc. 365; Baccus v. Louisiana, 232 U. S. 334, 34 Sup. Ct. 439, 58 L. Ed. 627. The federal Constitution does not forbid the setting apart in a separate class of all persons similarly situated. State v. Schlemmer, 42 La. Ann. 1167, 8 South. 307, 10 L. R. A. 135; Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923.
[10] And what we have here said applies equally to the next objection, that said statute unlawfully discriminates between the purchasers from these two classes of agents, by affording the protection of a bond to purchasers from itinerant agents, and not extending the same protection to purchasers from agents with fixed places of business. This classification of the purchasers is merely a result, or incident, of the classification of the agents. If, therefore, the one classifi *717 cation is justified, so is the other, which is based upon precisely the same consideration. Indeed, if a bond is to be exacted at all against the possible frauds of these itinerants, the victims of the frauds would seem obviously to be the proper parties to be given recourse upon it.
Another alleged ground of nullity is that, in so far as this statute imposes this license and these onerous conditions upon the agents of foreign corporations, it operates as a restraint upon interstate commerce, and is null; and that, being null as to these agents, it is also null as to the agents of domestic corporations, as there would otherwise be discrimination against the latter class of agents by imposing upon them burdensome conditions from which their competitors in business, the agents of foreign corporations, would be left free.
The idea here is that stocks and bonds are subjects of interstate commerce, and that the said statute does not distinguish between such foreign stocks and bonds as have already been brought into the state and form part of the common mass of the property of the state, and such as have not yet been brought into the state, and would have to be transported into this state for delivery if sold here; that it has reference equally to both of these classes of stocks and bonds; and that in the case of the latter class it operates as a restraint upon interstate commerce.
Stocks are things of value, and form the subjects of barter and sale, and would have to be transported for delivery. They come, therefore, within the reasoning of the ease of Champion v. Ames (Lottery Case), 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492, where the Supreme Court of the United States held that lottery tickets are subjects of commerce.
And the same thing may be said of bonds, which are now considered to have a situs of their own, independent of that of their owner. New Orleans v. Stempel, 175 U. S. 309, 20 Sup. Ct. 110, 44 L. Ed. 174; Metropolitan L. Ins. Co. v. New Orleans, 205 U. S. 395, 27 Sup. Ct. 499, 51 L. Ed. 853.
[11] And 'it is well settled that a license imposed upon the agent of a foreign corporation selling articles of commerce which at the time of the sale are in another state operates in restraint of interstate commerce, and in violation of the interstate commerce clause of the Constitution of the United States. Tax Collector v. Pettigrew, 44 La. Ann. 356, 10 South. 853, and United States Supreme Court decisions there cited'; Paul v. Virginia, 8 Wall. 168, 19 L. Ed. 357; Crutcher v. Kentucky, 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649, and cases there cited; Hooper v. California, 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297, and. eases there cited.
[12] A statute, however, will not be so interpreted as to render it, or any of its parts, unconstitutional, if, without doing violence to its language, a saving interpretation be possible. See Western Union Tel. Co. v. State, 82 Ark. 309, 101 S. W. 748, 12 Ann. Cas. 82, where the authorities .on this point are extensively cited and many illustrations given. See, also, 36 Cyc. 1103, 1112; State v. Peet, SO Vt. 449, 68 Atl. 661, 14 L. R. A. (N. S.) 677, 130 Am. St. Rep. 998. Under this doctrine the stocks and bonds of foreign corporations to which this statute has reference would have to be held to be those only which are already incorporated into the mass of the property of the state. There are no express words to the contrary in the statute.
This statute perhaps might also, constitutionally, include mere subscriptions to foreign stock; for, until stock is actually subscribed for, it has no actual existence (10 Cyc. 265), and hence is not an article of commerce ; and the subscribing to it, while in common parlance called a selling of it, is in reality nothing more than a contract of subscription, and, as such, under the reasoning of the court in the case of Paul v. Virginia, *719 8 Wall. 168, 19 L. Ed. 357, is not interstate commerce.
And, in like manner and for the same reason, the transaction by which a corporation would sell its theretofore unissued, bonds would not constitute interstate commerce, as it would not be in reality a sale or a transaction of commerce, but merely a contract of loan.
[13] Even, however, if it were held that this statute has reference to foreign stocks and bonds not yet incorporated into the mass of the property of the state, and is to that extent null, this would not have the effect of nullifying it as a whole. It would continue to be valid in so far as applicable to all other stocks and bonds.
“The weight of authority is to the effect that, where a state statute is primarily intended to regulate domestic commerce, it will be sustained so far as it relates to such commerce, although it contains clauses invalid as attempting to regulate interstate commerce.” 36 Oyc. 983; Standard Oil Co. v. State, 117 Tenn. 618, 100 S. W. 705, 10 L. R. A. (N. S.) 1015; Allen v. Texas R. R. Co., 100 Tex. 525, 101 S. W. 792; State v. Peet, 80 Vt. 449, 68 Atl. 661, 14 L. R. A. (N. S.) 677, 130 Am. St. Rep. 998.
The decision of the Supreme Court of the United States in the case of Emert v. State of Missouri, 156 U. S. 296, 15 Sup. Ct. 367, 39 L. Ed. 430, is cited by the Attorney General as authority for the contention that this statute is valid even as to stocks and bonds not yet at the time of the sale incorporated into the mass of property within the state. But the court in that case said:
“There is nothing in the case to show that he ever offered for sale any machine that he did not have with him at the time. * * * So far as appears, the only goods in which he was dealing had become part of the mass of property witldn the state.”
The court distinguished the case frbm that of Robbins v. Shelby Co. Taxing Dist., 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694, where the goods had not been already brought into .the state and mingled with the rest of the property within the state, but where the sale of them was to be negotiated with a view to bringing them thereafter into the state.
In the other case cited by the Attorney General, Baccus v. State of Louisiana, 232 U. S. 334, 34 Sup. Ct. 439, 58 L. Ed. 627, the question of interference with interstate commerce was not raised, but only that of undue discrimination.
, [14] As to the proposition that the state may exact a license for the privilege of doing business in the state, it is subject to the qualification that the license must not be so levied as to operate as an interference with, or restraint upon, interstate commerce, and that it does so operate if it taxes the person engaged in 'selling articles of commerce not yet brought into the state and mingled with the mass of property within the state. Tax Collector v. Pettigrew, supra.
If the agent were selling the goods merely as an incident to Ms own business, a different case would be presented. For example, a stockbroker, though he deal exclusively in foreign stocks (Nathan v. La., 8 How. 73, 12 L. Ed. 992), and a commission merchant who sells cattle consigned to him for sale, though the cattle come from another state (Hopkins v. U. S., 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290), are not engaged in interstate commerce. In such a case the tax is upon the business of the agent as contradistinguished from that of the principal.
We conclude that the statute is valid, and pass to the other points raised in the case.
[15] The prosecution having tendered oral evidence to prove the facts and circumstances- and conditions of the alleged sale of stocks upon which the prosecution is based, the accused objected to the evidence on the ground that “the alleged sale of stock could only be shown in the manner required by section 1 of Act No. 180, p. 265, of 1910,” and on the further ground' that the certificate of the stock would be the best evidence.
*721 We will not examine the latter ground of objection; as the ruling upon it, even if erroneous and originally prejudicial, was rendered harmless by the subsequent introduction in evidence of all the documents executed by the parties at the time of the alleged sale, and also by the accused voluntarily making upon the witness stand a full statement of the whole transaction.
[16] As for the ground of objection based upon Act No. 180 of 1910, that statute does not undertake to prescribe an exclusive mode of evidencing as between the parties a sale of stocks; its object is merely to regulate the mode of transfer upon the books of the corporation, and to furnish a rule for deciding between claimants contesting over the ownership of the stock.
[17] The documents executed between the accused and the person they dealt with are brought up as part of a bill of exceptions. They show that the transaction consisted of a subscription to stock, and was not, properly speaking, a sale of stock; and the accused now contend, as they contended below, that such a transaction as this does not come within the purview of said statute, which denounces only the selling of stock.
We have intimated hereinabove that a subscription to stock comes within the intendment of said statute, as coming within the popular meaning of the term “selling stocks” ; but it is not necessary that we should, and we do not, pass upon that question, as it does not come before this court in such shape as to give this court jurisdiction of it. The only way, so far as we can see, the point could have been brought up in proper shape for this court to consider it would have been by objecting to all evidence of a subscription to stock as irrelevant, or not corresponding with the indictment, which alleged a sale of stock, and by reserving a bill to the overJUling of the objection, and incorporating all the facts in this bill. As the case stands in this court, the judge, by finding the accused guilty, has found that they sold the stock. This finding the court is without jurisdiction to review, as it involves a question of fact, and the jurisdiction of this court is limited to questions of law alone. The question is whether the evidence adduced on the trial was sufficient to sustain the allegations of the indictment.
The fact that all the evidence is brought up as part of a bill of exceptions, and that there is no dispute over it, does not alter the legal situation. Thus:
In the case of State v. Maloney, 115 La. 498, 39 South. 539, all the evidence was brought up in that manner, and there was no dispute over the facts. The case was tried below upon a statement of facts agreed upon and reduced to writing. The question was whether the act thus admittedly committed by the accused constituted the crime charged in the indictment — precisely the contention made in the present case. The crime was the keeping of a poolroom. The court held that its jurisdiction, confined as it was to questions of law alone, did not extend to passing upon the sufficiency of said evidence to support the charge made in the indictment.
So reluctant has the court been to consider the evidence by which the judgment in a criminal case has been supported, and so cautious has it been not to transcend its jurisdiction in the premises, that in the case of State v. Rabb, 115 La. 734, 39 South. 971, it went so far as to refuse to take cognizance even of the facts stated in a bill of particulars, though the contention was that, admitting them all to be true, no crime was shown.
In State v. Green, 111 La. 89, 35 South. 396, the court said that, if no evidence whatever —literally none — has been offered upon a point essential for making out the crime charged, or, in other words, for establishing *723 one of the constituent elements of the crime, and objection is made to allowing the case to go to the jury, and a bill is reserved, the question involved might be held to be one purely of law; namely, whether in the absence of all evidence on an essential point, the court should send the case to the jury. The doctrine of that case militates in no way against that of the two foregoing cases, or against that of the following:
In State v. Hauser, 112 La. 313, 36 South. 396, the question was whether the facts ot the case, as contained in a statement of the admitted facts brought up in a bill of exceptions, constituted the crime charged in the indictment; and the court held that these facts could not be inquired into.
In State v. Harris, 107 La. 325, 31 South. 782, the court held that the statement made by the trial judge to the effect that the crime had been committed in another parish could not be considered by this court as it was a question of fact upon which the jury had had to pass. The court had no doubt of the truth or correctness of the judge’s statement, but found itself without jurisdiction to inquire into the facts contained in the statement.
So in State v. Miller, 107 La. 797, 32 South. 191, the facts were agreed upon, and the question was as to whether they constituted the crime charged in the indictment; and the court held it had no jurisdiction of that inquiry.
Instances of the same kind might be multiplied, but the foregoing ought to suffice to show that, however plausible may be the proposition that, where there is no dispute over the facts, only a question of law is involved, this court has heretofore taken a different view, and consistently adhered to it.
.Our conclusion is that there is no error in the judgment below; hence the writ of certiorari herein is recalled, at the cost of the relators.
O’NIELL, J„ concurs in the decree.