454

Allan J. Postel, Administrator of the Estate of Henry Hucke, Deceased, et al., Appellees, v. E. R. Hagist, Appellant.*

---

* The court has directed that this opinion which was formerly ordered to be published in abstract form (249 Ill. App. 663) be reported in full.

Heard in this court at the
February term, 1928.                          Opinion
filed June 1, 1928.

WILLIAM E. WHEELER and BRUCE A. CAMPBELL, for appellant; WHEELER & OEHMKE and KRAMER, KRAMER & CAMPBELL, of counsel.

D. E. KEEFE, for appellees; KEEFE & LISTEMAN, of counsel.

MR. JUSTICE NEWHALL delivered the opinion of the court.

This is an appeal from a decree of the circuit court of St. Clair county entered in favor of appellees (complainants) and against appellant (defendant) for the sum of $58,510.97.

The cause was referred to the master in chancery of the circuit court to hear the evidence and state his conclusions of law and fact.

The master heard the testimony offered by the respective parties including certain depositions taken by agreement of the parties and reported in substance as follows:

"This is a suit by Allen J. Postel, administrator of the estate of Henry Hucke, deceased, Katie E. Kammann, Phillip M. Kammann, Alma K. Postel, Erna E. Postel, Oneida M. Hucke, Laurine L. Hucke, a minor, by Allen J. Postel, her next friend, against E. R.

Hagist to compel him to account for proceeds of the sale of four hundred shares of the capital stock of Kolb Coal Company of the property of Henry Hucke, trustee, sold by Mr. Hagist, and to require him to pay over the amount of such proceeds not previously accounted for with interest thereon.

"The theory of the bill of complaint is that in a certain transaction wherein the defendant Hagist sold eight hundred shares of the capital stock of the Kolb Coal Company, an Illinois corporation, to one C. C. Field, the defendant Hagist acted as a trustee for Hucke in the sale of four hundred shares, but that in settling with Hucke, Hagist paid only a portion of the amount realized from the sale of the Hucke stock and wrongfully retained the remainder of such amount.

"The answer sets up the defense that the defendant did not represent and act for Hucke in the sale, and denies that defendant ever assumed to act for Hucke, and avers that from March 20, 1922, the defendant had an option to purchase the stock of Hucke for the sum of $130,000.00; that on March 23, 1922, the defendant exercised his rights under said option and purchased said stock for said sum and on the same date paid Hucke said amount of $130,000.00 in payment of said four hundred shares. It is denied that defendant failed to account for any moneys owing to Hucke or that he concealed any facts which he was under obligation to disclose.

"The Kolb Coal Company is an Illinois corporation, operating coal mines at Mascoutah, St. Clair County, Illinois. For a long time prior to March, 1922, the stockholders were P. H. Sauter (600 shares), M. S. Fuqua (600 shares), E. R. Hagist (400 shares) and Henry Hucke, as trustee (400 shares).

"On March 20, 1922, the defendant Hagist obtained from Henry Hucke a written option to purchase the stock at any time before March 24, 1922, for the sum

of $130,000.00. The option contract recites that Henry Hucke, as trustee for the persons therein named, possessing four hundred shares of capital stock of Kolb Coal Company, in consideration of the sum of one dollar, receipt of which was acknowledged, agrees to sell said four hundred shares to E. R. Hagist at any time on or before March 24, 1922, for the sum of $130,000.00 net cash. The circumstances under which the option was given are not in evidence, for the reason that Hucke is dead and Hagist is not a competent witness to relate them. It is apparent, however, that at the time the option was delivered Hucke also gave Hagist the certificate for the Hucke stock, endorsed by him in person.

"On March 23, 1922, in pursuance of some previous arrangement, Hagist met Field and his associates at the directors' room of the First National Bank in St. Louis, Missouri. . . . During this meeting a deal was made whereby Mr. Hagist sold and delivered to Field and his associates eight hundred shares of said capital stock, being Hagist's four hundred shares and the four hundred shares of Hucke, concerning which this suit arises. The buyers paid the amount of $400,000 by delivering to Hagist a check for $370,000.00 which was exchanged for a cashier's check on the First National Bank, in St. Louis, and a check for $30,000 which was delivered over to the Kolb Coal Company to discharge an obligation of Hagist to the Company for that amount. On the same day, after banking hours, Hagist paid Hucke at Mascoutah, where both parties resided, the sum of $130,000.00, which Hucke deposited to his account in the First National Bank of Mascoutah. . . .

"The equitable ownership of the stock for which Hucke was trustee was as follows: Hucke himself owned a one-fourth interest therein. Katie E. Kammann and Mary E. Kammann each owned a one-fourth

interest therein and Phillip M. Kammann, Elva K. Kammann, Meta E. Kammann, Karl P. Kammann, Alma K. Postel, Erna E. Postel, Oneida M. Hucke and Laurine L. Hucke each owned one-thirty-second interest therein.

"Elva K. Kammann, Meta E. Kammann, Karl P. Kammann and Mary E. Kammann, who were made defendants in the amended bill filed their written entry of appearance and therein stated that they and each of them claimed no interest in the subject matter of this suit. This disclaimer results that the defendant Hagist is not required to account for any interest in the proceeds which these defendants would be entitled to receive. Their interests were: Mary E. Kammann, one-fourth; Elva K. Kammann, one-thirty-second; Meta E. Kammann, one-thirty-second, a total of eleven-thirty-seconds. The amount which Mr. Hagist withheld was $70,000, and eleven-thirty-seconds of this amount which is not sought in this proceeding amounts to $24,062.50. . . .

"The total amount of principal and interest owing this date (by the defendant to the complainants), is the sum of $57,517.55. . . ."

Appellant filed objections to the master's report which were overruled and ordered by the court to stand as exceptions. No objections or exceptions were filed by appellees to the master's findings of fact and the trial court entered a decree in accordance with the master's findings and recommendations.

Appellant contends that there is an entire variance between the allegations of the bill and the proof; that appellees have failed to prove their case and that the trial court erred in refusing to sustain appellant's exceptions to the master's report.

The report of a master in chancery, while prima facie correct, is of an advisory nature and all the facts are open for consideration in the first instance by the

trial court, and in case of appeal, by the reviewing court, and without regard to the findings of the master upon any particular question of fact, the ultimate and final question is as to whether or not the decree rendered by the chancellor is the proper one under the law and the evidence. *Chechik v. Koletsky*, 311 Ill. 433; *Hoelscher v. Hoelscher*, 322 Ill. 406; *Union Bank of Chicago v. Gallup*, 317 Ill. 184.

The above rule is subject, however, to another rule of chancery practice that where no objections or exceptions are filed to the master's report, the findings of fact of the master are conclusive as against a party, who has the right, but does not object in apt time to the master's report. *Johnson v. Voudrie*, 233 Ill. App. 572; *Singer, Nimick & Co. v. Steele*, 125 Ill. 426; *Gehrke v. Gehrke*, 190 Ill. 166; *Barney v. Commissioners of Lincoln Park*, 203 Ill. 397.

Under these well-settled rules appellees are now concluded by each and every finding of fact found against them by the master, while appellant having fully and specifically objected and excepted to all findings against him is in a position to urge here that such findings are not supported by the evidence and that the chancellor did not enter a proper decree under the law and evidence.

In order to clarify the issues that are properly preserved for consideration by this court it is necessary to briefly refer to those findings of fact by the master which under the above rules of chancery procedure should be taken as conclusive against appellees.

The master found that the following averments of the appellees' bill of complaint were *not proven* by the evidence, viz.: "That (appellant) E. R. Hagist represented to C. C. Field that Henry Hucke was in ill health and that Hagist could induce Hucke to sell if Field would buy Hagist's stock; that Hucke had previously agreed with Hagist that Hagist should repre-

sent Hucke in the sale and should receive for Hucke whatever amount the stock could be sold for, with the condition that the four hundred shares should not be sold for less than $130,000.00, to all of which Hagist agreed; that Hagist concealed from Hucke the fact that Hagist had sold the Hucke stock for more than $130,000.00 and fraudulently represented to Hucke that $130,000.00 was the full amount which the Hucke stock had sold for.''

The master further found ''that (appellees) complainants undertook to prove but *failed to establish* that any general arrangement existed whereby Hagist attended to the affairs of Hucke in relation to the Kolb Coal Company.''

The master reported that the foregoing material averments of the bill were not proven by the complainants, but did find that the following averments of bill were sufficiently proven by the evidence, viz.:

''That Hagist acted for Hucke and did not act under his option contract; that if Hagist had an option on the Hucke stock, he never exercised his rights under it; that Hagist assumed to act for Hucke and did not act in good faith and retained a large sum of money which rightfully and equitably belonged to complainants; that complainants did establish that the shares of stock (in question) were in the possession of Hagist; that Hagist did not act by virtue of his option and that Hagist undertook to act for Hucke in the sale; that this in effect established a trust relation and compels Hagist to account in full for the proceeds of his transaction.''

If appellees' contentions are to prevail in this case, it must be because the affirmative findings of the master in behalf of appellees justify the entry of the decree of the court below. One of the questions to be determined is whether the master was justified in finding from the evidence that appellant Hagist did not act by virtue of his option, but that he assumed to and did act as agent and trustee for Hucke and therefore was

in duty bound to account to him for one-half of the entire sale price of the Hagist and Hucke stock which admittedly was sold for a gross sum of $400,000.

In addition to the facts set forth in the master's findings, the record shows that for a long time prior to March 23, 1922, the day the sale in question was made, all of the stockholders in the coal company had been willing and anxious to sell their holdings of stock and numerous negotiations had taken place between Field and the various stockholders, but nothing tangible resulted. In one of these negotiations the Hucke stock had been signed, in blank, and placed in escrow at an agreed price for delivery at considerable less than was obtained through the sale to appellant.

Shortly prior to March 23, 1922, Field began new negotiations for acquiring the stock of the coal company. Field secured an option on the Fuqua 600 shares for $125,000 and on the Sauter 600 shares, but the record is not clear as to the price of the latter, but both the Sauter and Fuqua stock was pledged to appellant as president of the coal company to secure debts owing by them to the company.

The coal company was the owner of a large amount of bonds and other securities, all of which were in the possession of appellant as president of the company. It appears that Field was attempting to purchase all the stock of the company at one time so that he might use the securities owned by the company to complete his purchase.

During the negotiations between appellant and Field the latter stated that he was willing to purchase his stock for $300,000, but did not wish to purchase the Hucke stock, as appellant's stock together with the Sauter and Fuqua holdings would give him such control of the company (more than 2/3) that he could force the Hucke interest out. Appellant on March 20, 1922, secured the option in question from Hucke together with his 400 shares of stock indorsed in blank, and sold

the same with his 400 shares for $400,000. On the day of the sale, Field apparently lacked $100,000 to complete the purchase of 800 shares controlled by appellant, and he borrowed the same from the bank where the deal was consummated.

Appellant and Hucke resided at Mascoutah where they carried on rival general stores and were connected with the same bank. Hucke was treasurer of the coal company and kept in close touch with its affairs but for personal reasons of his own he had his brother-in-law look after his interests at the St. Louis office of the company. He was a man of considerable means, attended to his own business, as well as that of others, and was fully capable of protecting his own interests at the time in question and up to the day of his death, which occurred about 18 months thereafter.

There is no direct evidence, except as shown by the written contract, and by the surrounding circumstances in evidence, as to what actually occurred between Hucke and appellant leading up to the particular transaction in question, on account of the fact that this suit was instituted after Hucke's death and appellant was therefore not a competent witness to testify to the transaction.

The proof shows that appellant went to the office of Troll, an attorney who represented the coal company and had been familiar with the prior negotiations of Field. Troll prepared the option contract which is dated March 20, 1922, the sale price being left blank, and the same was afterwards inserted in Hucke's own handwriting and delivered with the 400 shares of stock indorsed by him in blank which was produced by appellant on the day of the closing of the deal on March 23, 1922.

Prior to signing and delivering the option contract and stock to appellant, Hucke discussed the amount of the consideration, to be placed in the option, with Kam-

mann, whose wife was a beneficial owner of part of the stock. They agreed on a consideration of $125,000 and later Hucke phoned Kammann that he had increased the price to $130,000 and asked him if that was satisfactory. Hucke knew that appellant was negotiating with Field and advised Kammann that the deal was coming to a head.

A few days after Hucke had received the $130,000, which was paid to him on the evening of the day appellant closed his deal with Field, Hucke held a family meeting of those who were beneficially interested in the distribution of the $130,000 realized by him as trustee and then distributed the fund among the parties entitled thereto, and at this time a copy of the option agreement was exhibited.

The master stated in his report that the testimony of appellee Julius Postel, father of Allan Postel, administrator of the Henry Hucke estate, proved that Hagist *presumed* to act for Hucke in the sale and that he did not rely upon his option contract to buy the Hucke stock and that he was concealing the price actually received for the 800 shares.

The master also stated in his report that the testimony of Allan Postel proved that the defendant Hagist *presumed* to act for and on behalf of Hucke and that he did not rely upon his right to purchase the Hucke stock; that certain circumstances corroborate this conclusion, viz.: That there was no assignment of the option and no closing of it prior to the sale to Field, and that because appellant did not, so far as the evidence discloses, by word or deed, elect to exercise his option nor transfer it.

The testimony of Julius Postel was not denied by appellant and the material parts thereof are in substantial corroboration of appellant's theory of the facts. The master drew certain conclusions from the figures testified to by Julius Postel, which might indicate that appellant was not telling just what amount

was realized from the stock in question, but appellant was under no legal obligation to disclose to the witness the truth concerning the transaction. It does not appear that the witness was in any way acting for Hucke or that he ever communicated to him this conversation.

The testimony of Allan Postel was denied by appellant and his denial was corroborated by his son, who was present during the alleged conversation. In this conversation appellant is alleged to have said that he received only $260,000 for the entire 800 shares, but we find that appellant's version of this alleged meeting with Allan Postel is as worthy of belief as that of Postel's.

It is apparent, however, from the master's findings that he placed his principal reliance for his conclusions upon the assumption that appellant did not have the legal authority under the option contract to sell the Hucke stock to Field and thereafter pay Hucke the amount named in the option contract. It is apparent that the master arrived at his conclusions and presumptions, concerning the manner of appellant's fulfillment of his contract, from loose and uncertain statements alleged to have been made after the transaction. By reason of the death of Hucke, and Hagist's inability to testify to the real situation, the master indulged in unwarranted conclusions and presumptions against appellant, which the evidence and the law applicable thereto does not justify.

We are thus brought to a consideration of the principal question in the case, which the master stated to be, whether Hagist exercised his option in such legal manner as to authorize him to retain the benefits of his contract, or whether Hagist acted for and on behalf of Hucke as agent and trustee in making the sale.

There is no serious contention as to the legality of the option itself, and to determine the full legal rights

thereunder, there must be taken into consideration the further undisputed fact that Hucke, at the time of the delivery of the signed option, also delivered therewith the very stock which was to inure to the benefit of Hagist at his option under the terms thereof.

An option is a continuing offer which the offerer may not withdraw until the expiration of the time limit. *Adams v. Peabody Coal Co.*, 230 Ill. 469.

The undisputed evidence shows that appellant had the option prepared by a lawyer, leaving only one condition to be inserted, viz., the price for the stock. It was then delivered to Hucke, who after consultation with Kammann, wrote in the price of *"one hundred and thirty thousand dollars,"* then signed and delivered the same with the stock to appellant. On the day of the sale the signed option and indorsed stock were produced by appellant. Appellant delivered the stock to Field and on the same day, within the time fixed in the option, paid the price therein fixed to Hucke and took his receipt therefor. Hucke distributed the proceeds, received from Hagist, to the beneficiaries entitled thereto and at the time of the distribution exhibited a copy of the option. This evidence clearly shows that appellant acted under the option agreement.

There is no convincing evidence in the record, which sustains the contention that Hagist acted as agent or trustee for Hucke, or that he occupied any fiduciary relation or was guilty of any fraud which would require him to account for any moneys secured by him over and above the amount fixed in the written option contract.

Appellees contend that Hagist was legally bound to *first* accept the option within the time fixed, and pay the price stipulated, *before* he would be authorized to deliver the stock to Field, and that Hagist's act of *selling* and *delivering* to Field *before paying Hucke* operated to make Hagist liable for the actual price received.

If it be said that Hagist did not strictly follow the literal wording of the option, yet Hagist's act of selling under the option and then paying Hucke the precise amount agreed upon was subsequently ratified by Hucke. If Hucke had wished to secure the payment of his money before parting with the control of his stock, he had the full legal right to protect himself by withholding possession of the certificate. He did not do this, but in all probability he was anxious to sell and was willing and intended to impower Hagist to make delivery of the stock and rely upon his responsibility to either return the stock or cash within the time fixed in the option. In 13 C. J. 285, it is said: "When it is said that the acceptance must be *'communicated' to the offerer,* this does not necessarily mean that he shall have actual personal notice of it. The rule is that the agreement becomes obligatory from the moment the minds of parties meet. . . . It is always sufficient that the offer be accepted in the mode either expressly or impliedly required by the offerer; and if the offerer requires or suggests a mode of acceptance which turns out, so far as giving actual notice to the offerer, to be insufficient or entirely nugatory, it is the fault of the offerer, and the agreement is complete."

Applying the above principles to the instant case, it is clear that Hucke, by delivering the stock, signed in blank, with knowledge of what purpose it was to be used for, thereby agreed that appellant had the authority, at any time during the life of the option, to sell and deliver the stock and thereby become accountable to Hucke for the price named in the option.

The provisions of the Uniform Sales Act, Cahill's St. ch. 121a, ¶ 4 *et seq.,* are applicable to the sales of corporate stock. See *Illinois-Indiana Fair Ass'n v. Phillips,* 328 Ill. 368. Section 18, Cahill's St. ch. 121a, ¶ 21, of the above act provides as follows:

*"Property in specific goods passes when parties so intend.]* (1) Where there is a contract to sell specific

or ascertained goods, the property in them is transferred to the buyer *at such time as the parties to the contract intend it to be transferred.*

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, *the conduct of the parties,* usages of trade and *the circumstances of the case.*"

Section 19, Cahill's St. ch. 121a, ¶ 22, of the same act provides:

19. *"Rules for ascertaining intention.*] Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer. . . .

"(2) When goods are delivered to the buyer on approval or on trial or on satisfaction, *or other similar terms,* the property therein passes to the buyer—.

"(A) When he signifies his approval or acceptance to the seller *or does any other act adopting the transaction.*"

Section 48, Cahill's St. ch. 121a, ¶ 51, of the same act provides as follows: "The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, *or when the goods have been delivered to him,* and he does any act in relation to them *which is inconsistent with* the ownership of the seller, . . ."

Under these provisions of the statute it is solely a question of what the parties intended by their contract, acts, conduct and the objects they had in view and wished to carry out. Hagist, by his act of selling and delivering Hucke's stock to Field, thereby, under the statute, elected to accept and adopt the terms of the option which made it obligatory upon him to pay Hucke the agreed price at the time therein fixed.

By section 48, Cahill's St. ch. 121a, ¶ 51, Hagist (the buyer) must be deemed to have accepted the terms of the option, when, as this section provides, the stock had

been delivered to him and he had sold and delivered the same to Field, *which act was inconsistent with the ownership of Hucke (the seller) in said stock certificate.*

The option contract in question when considered in connection with a simultaneous delivery of the stock certificate is somewhat analogous to the so-called *"sale or return"* contract as is described and commented on in *House v. Beak,* 141 Ill. 290, 300, and in this class of contracts it is held that the title vests immediately in the purchaser, defeasible on the performance of the condition. In such cases, the property in the goods passes to the purchaser subject to an option in him to return them within the fixed time; the purchaser deals with the goods as his own, disposes of them as he pleases and is only liable to pay for them at the price fixed without any reference to the price at which he sells them.

After due consideration of all the evidence we are of the opinion that the decree of the court below is not supported by a preponderance of the competent evidence in the record and that the trial court erred in not sustaining the exceptions of appellant to the master's report.

For the reasons aforesaid the decree of the circuit court is reversed and the cause remanded with directions to dismiss appellees' bill of complaint for want of equity.

*Reversed and remanded with directions.*