DEE FUREY MOTT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71903. Promulgated December 18, 1936.

*Prewitt Semmes*, Esq., for the petitioner.
*E. L. Corbin*, Esq., for the respondent.

OPINION.

Arundell: The loss claimed on the sale of Fourth National Investors stock was disallowed solely because of petitioner's inability to substantiate cost and sales price figures at the time her return was audited. These figures were supplied at the hearing, and we have found them as facts with the amount of resulting loss which is deductible in 1930.

There is no issue as to the amount of the losses sustained on the Westinghouse and United States Steel stocks; the controversy is as to the year in which the losses are deductible. They are claimed as deductions for 1930. The respondent disallowed them as 1930 deductions, taking the position, as we understand it, first, that the sales were short sales and not covered until 1931, and, second, that if not short sales they were nevertheless not completed in 1930 because of petitioner's failure to deliver stock certificates in that year.

The first proposition is unsound. "A short sale is a contract for the sale of shares which the seller does not own or the certificates

for which are not within his control so as to be available for delivery at the time when, under the rules of the Exchange, delivery must be made." *Provost* v. *United States*, 269 U. S. 443. Here the petitioner owned the shares and they were within her control and available for delivery. She intended to sell the shares that she owned, and it is stipulated that they were sold. Mere failure to deliver certificates is not alone enough to establish a short sale. *C. B. Ferree*, 32 B. T. A. 725; affd., 84 Fed. (2d) 124. Accordingly, it is held that the sales of Westinghouse and United States Steel shares were not short sales.

Respondent's second proposition brings us into a field in which there is some confusion among the cases. His claim is that section 9520 of the Michigan Compiled Statutes of 1929 requires delivery of the certificates to complete the sale. That section, and those immediately following it enact into the Michigan statutes the provisions of the Uniform Stock Transfer Act, which has been adopted in twenty some states. That section, so far as material here, provides:

9520 Section 1.. (*How title to certificates and shares may be transferred.*) Title to a certificate and to the shares represented thereby can be transferred only,

(a) By delivery of the certificate indorsed either in blank or to a specific person * * *, or

(b) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby * * *.

The Michigan statutes also contain, like those of many other states, the provisions of the Uniform Sales Act, among which are the following, as numbered in Michigan Compiled Statutes of 1929:

9457 Section 18. *Property in specific goods passes when parties so intend.* Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case.

9458 Section 19. *Rules for ascertaining intention.* Unless a different intention appears, the following are the rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer:

Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed.

The presence of the above provisions in the same statute books has given rise to the question of whether corporate stocks are subject to the provisions of the Uniform Sales Act (Sales of Goods Act it is called in some states), or whether they are in all respects governed

by the Uniform Stock Transfer Act. No uniform rule has been laid down by the courts in the various jurisdictions. In *Agar* v. *Orda*, 144 Misc. 149; 258 N. Y. S. 274, it is said:

* * * The question whether shares of stock are "goods" within the meaning of the Sales Act has long been the subject of controversy. 44 Harv. Law. Rev. 998; 32 Col. Law Rev. 547, 896. The passage of the Uniform Stock Transfer Act (Personal Property Law, art. 6, as added by Laws 1913, c. 600) has further complicated the problem.

Williston and Benjamin both hold that shares of corporate stock do not fall within the definition of "goods" laid down in the Sales Act. Williston, Sales, Section 619; Benjamin, Sales (5th Ed.) p. 173.

In some jurisdictions it has been expressly held that shares of stock are not subject to the Sales Act. *Millard* v. *Green*, 94 Conn. 597, 110 A. 177, 9 A. L. R. 1610; *Goodhue* v. *State Street Trust Co.*, 267 Mass. 28, 165 N. E. 701; *Guppy* v. *Moltrup*, 281 Pa. 343, 126 A. 766; *Smith* v. *Lingelbach*, 177 Wis. 170, 187 N. W. 1007. In other jurisdictions a contrary view prevails. *Postal* v. *Hagist*, 251 Ill. App. 454; *Davis Laundry & Cleaning Co.* v. *Whitmore*, 92 Ohio St. 44, 110 N. E. 518, Ann. Cas. 1917C, 988; *Corwin* v. *Grays Harbor Washingtonian*, 151 Wash. 585, 276 P. 902. In numerous cases the question was not squarely decided, the courts resorting to various sections of the Sales Act, as declaratory of the rules at common law. *Walker* v. *Northern & Western Finance & Trading Corp'n.*, 199 App. Div. 471, 191 N. Y. S. 722; *State ex rel. Spillman* v. *Central Purchasing Co.*, 118 Neb. 383, 389, 225 N. W. 46.

In concluding the opinion the court refers to an earlier New York case, *Friedman* v. *Bachmann*, 234 App. Div. 267; 254 N. Y. S. 689, in which it was held without discussion that corporate shares were subject to the Sales of Goods Act, and holds:

* * * The decision in *Friedman* v. *Bachmann* purports to lay down a definite rule on a subject of widespread commercial interest. Although the historical correctness of this rule may be challenged, it reflects a practical rather than a legalistic conception of the status of shares of corporate stock, and tends to conform to the needs of modern business practice.

In affirming *Agar* v. *Orda*, the Court of Appeals said (264 N. Y. 248; 190 N. E. 479):

* * * a strong argument may be made that the Legislature did not intend to include certificates of stock in its definition of "goods." Assuming that to be true, yet the fact remains that certificates of stock, like other "goods", are freely bought hand to hand, and analogy so complete may dictate that the rules governing sales be applied alike to "goods" and other personal property freely bought and sold and passing from hand to hand.

In Louisiana the Uniform Stock Transfer Act was enacted in 1910. The limited purpose of section 1, prescribing how title may be transferred, is described by the Supreme Court of that state in *State* v. *Schofield*, 136 L. 720; 67 So. 557, as follows:

The statute does not undertake to prescribe an exclusive mode of evidencing as between the parties a sale of stocks; its object is merely to regulate the mode of transfer upon the books of the corporation and to furnish a rule for deciding between claimants contesting over the ownership of the stock.

From a consideration of the above cases it seems to us sound to conclude that the Uniform Stock Transfer Act is not intended to prescribe an exclusive method for transferring property in shares of stock and that the question of when the property passes may be determined under the provisions of the Uniform Sales Act (Sale of Goods Act). The courts of Michigan do not appear to have passed on this question, although it has been held in that State that corporate stock is "goods" within the statute of frauds. *Sprague* v. *Hosie*, 155 Mich. 30; 118 N. W. 497. Under the provisions of the Uniform Sales Act quoted above it is not necessary that the goods be actually delivered in order to have a completed sale. The time of passing of title, and completion of sale, of specific or ascertained goods depends on the intent of the parties to the contract. In this case the petitioner through her broker contracted to sell specific goods—her shares of stock—which were in a deliverable state, and her intent was to sell them in the year 1930. In fact, the parties to the proceeding have stipulated that the shares "were sold by petitioner through E. A. Pierce and Company, a member of the New York Stock Exchange, on the 30th day of December, 1930." We have not regarded this as conclusive of the question presented, as the question is one of law and, further, it must be read in connection with the other matters stipulated, including that of the date of delivery. Cf. *Compania General, etc.* v. *Collector*, 279 U. S. 306. The stipulation, however, is in accord with our conclusion that the petitioner did sell her shares on December 30, 1930.

The Circuit Courts of Appeal have reached the same conclusion in cases very close on their facts to this one arising in jurisdictions where both of the Uniform Acts above quoted are in effect. In *Ruml* v. *Commissioner*, 83 Fed. (24) 257, a New York case, the taxpayer in 1928 directed a broker to sell 4,000 shares of corporate stock owned by the taxpayer but then held by a bank as collateral for a loan. By reason of the loan, the taxpayer was unable to make delivery of certificates for 2,500 shares until 1929 and the loss on those shares was held by the Commissioner not deductible in 1928. The Board affirmed the Commissioner and the Circuit Court reversed. The court found that it was the intention of the taxpayer to sell "the specific shares he owned and only those", and upon this, coupled with the further intent of the parties "that the particular shares then owned by the petitioner should be delivered to the broker, it follows that title to them passed to the broker in December [1928]." The opinion reads in part:

* * * Losses must be realized before they are deductible. *Weiss* v. *Wiener*, 279 U. S. 333 [49 S. Ct. 337, 73 L. Ed. 720, 7Am. Fed. Tax. Rep. 8865]. But when the evidence of realization is a sale of personal property it is not

always necessary to deliver the property before there may be a deduction of a loss. It is enough that the obligation to deliver is so fixed that the loss is reasonably certain in fact and ascertainable in amount. *Lucas* v. *American Code Company*, 280 U. S. 445.

In *C. B. Ferree*, 32 B. T. A. 725; affd., 84 Fed. (2d) 124, the taxpayer on December 27, 1929, had in his safety deposit box certificates for 800 shares of corporate stock. On that date he directed the sale of those 800 shares and the broker sold them on December 30 and 31 below cost to the taxpayer. There was no delivery of the certificates. In January and February 1930, the taxpayer through the same broker, bought 1,500 shares of the same stock and the broker delivered to him certificates for 700 shares. The Commissioner disallowed the loss on the 800 shares as a 1929 deduction, and the Board reversed, saying in part:

> * * * In the present case, the failure to deliver appears to have been without substantial significance. In all substantial respects the transaction was complete and petitioner had realized the results of his purchase and sale as completely as he ever would.

The Circuit Court, in affirming the Board, referred to the provisions of the Sales Act of Pennsylvania and the Uniform Sales Act that "the intention of the parties governs" and quoted the provisions of rule 1 for ascertaining intention under the Sales Act, set out above in our quotation from the Michigan statutes. The opinion of the court concludes:

> This petitioner intended to sell these shares in order to take a loss. This is justifiable under the statutes. The broker intended to execute the petitioner's order. The Sales Act allows delay of delivery. The Revenue Act does not prevent the petitioner from keeping 800 shares of stock which he owes to the broker when the broker owes him 800 shares of the same stock.

In *Francis S. Appleby*, 31 B. T. A. 533, a New York case (dismissed, C. C. A., 2d Cir., Oct. 1935), the taxpayer on December 30, 1930, directed a broker to sell for him shares in three corporations. The taxpayer owned the shares and had the certificates in his safety deposit box. The shares were sold on December 30, without delivery of the certificates by the taxpayer, who left town about that time and did not return until January 5, 1931. He made delivery the next day. In that case, as in this, the loss on the sale was claimed as a 1930 deduction and was disallowed by the Commissioner. It was contended there, as here, that as delivery was not made in 1930 title was not transferred under section 162 of the Personal Property Law (which is the New York enactment of the Uniform Stock Transfer Act), and there was no completed sale in that year. Without analysis of the cited statute, we held that "in all substantial re-

spects the transfer was, as to all concerned, effective in the earlier year [1930]", and allowed the loss in that year.

The above cases in the state courts, the Federal courts, and the Board give what seems to us a sound interpretation to the Uniform Acts. They recognize the practical situation that exists in the daily purchase and sale of the shares of the many corporations whose stocks are on the market and apply to such transactions the general rules governing sales of personal property. Under the cited cases harmonizing the two Uniform Acts it must be held in this case the sales involved were completed in 1930. The petitioner intended to sell in 1930 specific shares then available for delivery and the broker intended to sell those shares. And, as said in the *Ferree* case, the Sales Act allows delay in delivery.

Our conclusion here need not rest on our interpretation of the Uniform Acts. These acts can not control the matter of deductions under a Federal revenue act. Deductions for losses, like those for depletion, *Palmer* v. *Bender*, 287 U. S. 551, and depreciation, *Weiss* v. *Wiener*, 279 U. S. 333, are determinable by the Federal statute. "State law may control only when the operation of the Federal taxing act by express language or necessary implication, makes its own operation dependent on state law." *Burnet* v. *Harmel*, 287 U. S. 103. Here the statute allows deductions for "losses sustained during the taxable year." In the cases cited above—the *Ruml*, *Ferree*, and *Appleby* cases—this statute has been interpreted to mean that the loss has been sustained in the year in which the shares are sold by the broker, even though delivery of the certificates is delayed until the next year. This construction of the loss provision of the statute is in line with the tendency of the courts "to give a uniform application to a nationwide scheme of taxation." *Burnet* v. *Harmel*, *supra*. In this view it must be held here, following the *Ruml* and *Ferree* cases, that the loss was sustained in 1930 when the broker executed her order. In that year, regardless of refinements of title law, her obligation to deliver was fixed; her loss was certain in fact and ascertainable in amount. *Ruml* v. *Commissioner*, *supra*. Whether a different rule applies where certificates are not available for delivery need not be determined in this case.

Reviewed by the Board.

*Decision will be entered under Rule 50.*