George W. S. SWENSON and Ruth E. Swenson, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16988.

United States Court of Appeals Eighth Circuit.

Oct. 26, 1962.

J. Neil Morton, St. Paul, Minn., made argument for the petitioners and filed brief.

Arthur E. Strout, Atty., Dept. of Justice, Washington, D. C., made argument for respondent and Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., Lee A. Jackson, Robert N. Anderson, Arthur E. Strout, Attys., Dept. of Justice, Washington, D. C., were on the brief.

Before VOGEL and VAN OOSTERHOUT, Circuit Judges, and VAN PELT, District Judge.

VAN OOSTERHOUT, Circuit Judge.

This case is before us upon a timely petition for review of the decision of the Tax Court (opinion reported 37 T.C. 124) upholding the Commissioner's determination of a deficiency in income tax for the year 1957 as to petitioners George W. S. Swenson and Ruth E. Swenson, husband and wife, who filed a joint income tax return. The asserted deficiency arose out of Mr. Swenson's transactions and so for convenience we shall treat him as the sole petitioner and refer to him as taxpayer.

There is no dispute as to the basic facts which are stipulated for the most part. Such facts will be summarized to the extent necessary hereinafter.

The deficiency was based upon a determination that the taxpayer had disposed of stock he acquired from Minnesota Mining and Manufacturing Company, hereinafter called M.M.M., upon the exercise of an option granted him by said company's Executive Restricted Stock Option Plan within six months of the date of transfer of such stock to the taxpayer, and that hence such disposal required: (a) recognition of compensation income under § 421(a), Internal Revenue Code of 1954,[1] measured by the difference between the fair market value of the stock on the date of acquisition and the amount paid for the stock; and (b) recognition of short term capital gain under § 1222(1) measured by the difference between the net selling price and the fair market value of the stock on the date of acquisition.

The parties agree that the minimum holding periods of six months set out in § 421(a) relating to restricted stock options and § 1222(3) relating to long term capital gains are identical and are governed by the same principles.

The Tax Court held that the holding period of the stock commenced on January 16, 1957, and ended on July 16, 1957. Taxpayer concedes that if such dates are correctly determined the holding period would be exactly six months and not more than six months as required by the statutes, and that the deficiency determination would be correct. Thus, the vital issue presented is whether the Tax Court erred in its determination as to the commencement or the termination of the holding period.

Taxpayer urgently contends that the holding period of the stock under §§ 421 (a) and 1222 commences as soon as substantial contract rights accrue; that the taxpayer became the owner or substantial owner of the stock when he exercised his stock purchase option in strict conformity with its terms on January 10, 1957; that his holding period began on January 10, 1957, or in any event prior to January 16, 1957, and ended no earlier than July 16, 1957.

Sections 421 and 1222 and the Internal Revenue Code of 1954 as a whole contain no express statement regarding the prerequisites to the initiation or termination of the holding period of corporate stock.[2]

The cases considering the holding period have not required the actual issuance of stock or the transfer thereof upon the corporate books to start or end the holding period. It has been held frequently that the holding period of corporate stock begins or ends when a purchaser acquires substantial contrac-

---

1. All statutory references in this opinion are to the Internal Revenue Code of 1954, 26 U.S.C.A., unless otherwise indicated.

2. Section 1223(6), which reads: "In determining the period for which the taxpayer has held stock or securities acquired from a corporation by the exercise of rights to acquire such stock or securities, there shall be included only the period beginning with the date on which the

right to acquire was exercised," on its face lends support to the taxpayer's position. The Commissioner urges upon the authority of Weir v. Commissioner, 10 T.C. 996, that this statute applies only to rights arising out of stock ownership and does not apply to stock acquired by option. Since taxpayer does not make any claim under this section and as we think taxpayer is entitled to prevail without the aid of this section, we deem it inadvisable here to interpret this section.

tual rights which will ripen into full ownership unless defeated by a breach of contract by the other contracting party. Philip J. Lo Bue, 28 T.C. 1317, aff'd, 3 Cir., 256 F.2d 735; Mayer v. Donnelly, 5 Cir., 247 F.2d 322; C.A. Sporl & Co. v. Commissioner, 40 B.T.A. 829, aff'd, 5 Cir., 118 F.2d 283; Commissioner v. Robinson, 6 Cir., 103 F.2d 1009; Commissioner v. Dashiell, 7 Cir., 100 F.2d 625; Huntington Nat'l Bank v. Commissioner, 6 Cir., 90 F.2d 876; Ruml v. Commissioner, 2 Cir., 83 F.2d 257; Estate of James S. Ogsbury, 28 T.C. 93; W. F. Marsh, 12 T.C. 1083.

■ Taxpayer, to support his contention that the actual transfer of stock is not necessary to start the holding period, and the Commissioner, to support his claim that the holding period ends on the day of sale, cite and rely upon 3B Mertens, Law of Federal Income Taxation, § 22.104, and particularly the language thereof found at pages 446–47, reading:

"Where stock is sold on a stock exchange, delivery by the seller and payment by the buyer may not be required until the fourth full business day after the date on which the sale is executed; yet the seller's holding period ends on the day on which the selling order is executed on the exchange, and the buyer's holding period begins on the following day. The holding period of stock was decided to have begun when its ownership was acquired and not at a later date when the stock certificates were issued."

While it is true that the taxpayer acquired the stock here involved directly from the corporation rather than through a stock exchange, the foregoing language, which is generally accepted as stating the proper law, indicates that normally the issuance of the certificate is not a prerequisite to the acquisition of ownership sufficient to initiate the commencement of the holding period.

The words "nor within 6 months after the transfer of such share to him" appear in § 421(a). Treasury Regulations on Income Tax (1954 Code), § 1.421–1, defines the meaning and use of certain terms, including the following:

"(f) Transfer. For the purpose of section 421, the term 'transfer', when used in reference to the transfer of an individual of a share of stock pursuant to his exercise of a restricted stock option, means the transfer of ownership of such share, or the transfer of substantially all the rights of ownership. Such transfer must, within a reasonable time, be evidenced on the books of the corporation."

It is obvious upon a reading of the regulation that a transfer can occur prior to the issuance of the stock and that a transfer of substantially all rights of ownership is sufficient to start the holding period. This is made plain by the last sentence appearing in the excerpt from the regulation.

Revenue Ruling 59–418, 1959–2 Cum. Bull. 184 holds:

"A loss upon the sale of stock is sustained by a taxpayer on the date a contract for the sale of such stock was entered into and not at a later date when he delivers the stock to the purchaser."

Such ruling is supported by the statement contained therein that the taxpayer's obligation was fixed when he entered into the binding contract of sale by which he transferred his equitable interest in the stock. Supporting cases are cited, including Dashiell and Ruml, supra.

The Commissioner in his brief does not question the validity of the authorities cited, but contends that the situation here is distinguishable, stating:

"Those cases did not involve situations where the agreement between the parties specifically provided that the buyer should have no rights in the stock until the certificates were issued to him. Since in the above cases the intent of the parties as to the time of the transfer of ownership was not expressed in the contract, it was necessary for the courts

to apply other rules of construction in order to determine when the transfer took place. These 'stop-gap' rules are employed to fill the void that is left by the contracting parties."

In oral argument, counsel for the Commissioner conceded that were it not for the contractual provisions in the Restricted Option Plan and the contract thereunder between petitioner and M.M.M. to the effect "the participant shall have no interest in shares covered by this option until certificates for said shares are issued", the Commissioner would concede that the holding period would have commenced before January 16.

The rights of the taxpayer and other executives to stock options are fixed by the Executive Restricted Plan legally adopted by M.M.M. and a contract entered into between the company and the executives pursuant thereto. The material provisions of the plan and contract are set out in the Tax Court's opinion. Since the Commissioner concedes that but for the provisions above set out, the taxpayer would have acquired substantial contractual rights sufficient to start the holding period prior to January 16, we deem it unnecessary to set out the plan or contract provisions or go into the stipulated evidence in great detail.

 Taxpayer as an executive of M.M.M. had a right to purchase in January, 1957, 1000 shares of M.M.M. stock at $33.9375 per share, and on January 10 he served upon M.M.M. notice, on the prescribed form, of his election to exercise his option to purchase 1000 shares and paid the option price in full, all in strict accord with the provisions of the option plan and contract.[3]

The receipt of the check was acknowledged by inter-office memorandum on January 14 and on the same date the transaction was recorded in due course on the accounting records of the company. On January 14 M.M.M. directed its St. Paul transfer agent to issue 1000 shares of its stock to the petitioner. The transfer agent issued the certificate on January 16 and sent it to the company's registrar. Since unissued stock was used to satisfy options, the New York Stock Exchange by telegram authorized the registration of the stock. The certificate was delivered to the taxpayer on or shortly after January 16.

On July 16, 1957, taxpayer directed his broker to sell 700 shares of the stock that he had received upon the exercise of his option. The sale was made on that date. The stock certificate in completion of the sale was delivered to the registrar on July 22.

M.M.M. has at no time questioned the right of the taxpayer to receive the 1000 shares of stock upon the exercise of his option. Upon taxpayer's exercise of the option and the payment of the option price, M.M.M. was under a binding obligation to carry out its contract and deliver taxpayer 1000 shares of stock. The Commissioner relies upon the language in § 8 of the plan and § 11 of the contract heretofore quoted to the effect that a party having an option right shall have no interest in shares until the certificates for said shares are issued. Preceding the quoted language appear statements to the effect that M.M.M. shall not be required to deliver the stock due upon option prior to the admission of such shares to listing on the stock exchange, and providing further that if advised by counsel that the shares deliverable are required to be registered by federal law or sold only by prospectus, delivery of the stock may be deferred until the registration is effected or the prospectus is available, but that the company will proceed with diligence to meet all such requirements. Thus, it would seem that the provisions relied upon by the Com-

---

3. The plan required payment to be made by certified check. Taxpayer made payment by his personal check which was accepted by the company and promptly collected. A company official testified that the company did not require certified checks from executive officers, and the Commissioner makes no point of this variance.

missioner were placed in the instruments to protect the company against violations of registration or securities laws and regulations.

The Commissioner also relies upon a statement in § 5 of the plan to the effect: "Participant shall obtain no rights as a stockholder until shares are issued to him." Apparently this is in accordance with the general policy that a person is not entitled to exercise rights as a stockholder until his stock is duly registered upon the corporate books. The taxpayer is not here attempting to exercise any stockholder rights. In any event, we do not deem this provision inconsistent with the taxpayer's acquisition of an equitable interest in the stock or substantial contract rights therein.

The Tax Court held that the time of acquisition of stock is controlled by state law; that the stock option is a Minnesota contract; that under Minnesota law the rights of stockholders are governed by the laws of the state under which the corporation was formed, here Delaware. The Commissioner's brief reflects that he does not rely upon any peculiar provisions of Delaware law relating to contract interpretation, the Commissioner stating that the law of Minnesota is no different, and that the choice of law is not critical. The Tax Court stated that the corporation in the sale and issuance of stock assumes a contractual relationship with its shareholders; that the intent and meaning of a contract depends upon the language used, and that where the language is not ambiguous, the meaning of a contract presents a question of law for the court. We do not disagree with the legal principle stated.

 It is also a well-established rule of contract interpretation that a contract must be interpreted as a whole and that the intention of the parties is to be collected from the entire instrument. Individual words and phrases must be considered in connection with the rest of the contract. City of Harlan, Iowa v. Duncan Parking Meter Corp., 8 Cir., 231 F. 2d 840, 841; 17 C.J.S. Contracts § 297, p. 707; Restatement Contracts, § 235.

When the plan and implementing contract are considered as a whole, we believe it to be entirely clear that the parties, by the use of the language relied upon by the Commissioner, did not intend to take away the substantial contractual rights to the option stock conferred upon the taxpayer by the plan and the contract, but that such provisions were inserted only for the purpose of protecting M.M.M. from possible violation of stock exchange rules and provisions of the Securities Act. The plan and the implementing contract gave no right or discretion to M.M.M. to refuse to issue the stock which taxpayer was entitled to upon the exercise of his option. The language relied upon by the Commissioner merely permitted the company to delay the issuance of the stock to enable it to comply with specified rules and regulations. It was obligated to take prompt action to meet any requirements imposed by such laws and regulations

This is in accord with the practical interpretation placed upon the contract as reflected by the action of the parties. When the taxpayer exercised his option and paid for his stock on January 10, all possible difficulties with respect to stock exchange and securities laws and regulations had been satisfactorily ironed out. M.M.M. gave its transfer agent directions for the issuance of the stock on January 14 and the stock was issued and delivered to taxpayer shortly thereafter.

As heretofore pointed out, neither legal title to the stock nor the completion of the transfer of the stock on the corporate books is essential to start the holding period. We are convinced that the taxpayer, by the exercise of his option in strict accordance with its terms and the payment of the full purchase price, acquired a substantial contractual interest in the stock prior to January 16 within the meaning of such term as fixed by the cases first cited in this opinion.

We hold that the Tax Court erred in holding that the taxpayer's holding period on the option stock did not commence prior to January 16.

Since it is conceded that the holding period terminated no earlier than July 16, we do not reach the taxpayer's alternate contention that if the delivery of the stock was necessary to commence the holding period, it was likewise necessary to terminate the holding period.

The taxpayer held the stock he acquired by virtue of the option for more than six months before he sold 700 shares of such stock.

The decision of the Tax Court is reversed.