GEORGE J. BECKER AND ISABELLE BECKER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5135–64. Filed August 12, 1966.

George J. Becker, pro se.
*Alan M. Stark*, for the respondent.

BRUCE, *Judge:* Respondent determined a deficiency in income tax in the amount of $1,141 for the calendar year 1960. The sole issue for decision is whether shares of stock sold by George J. Becker were held by him for more than 6 months.

### FINDINGS OF FACT

The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

The petitioners are husband and wife. They reside in Ridgewood, N.J. They filed a joint income tax return for the calendar year 1960 with the district director of internal revenue at Newark, N.J. George J. Becker will be referred to as the petitioner.

The petitioner is a district sales manager for Minnesota Mining & Manufacturing Co., hereinafter referred to as the company, in Ridgefield and has held such position since prior to May 13, 1958. The company was incorporated in Delaware and has its home office in St. Paul, Minn. At all times involved herein, the outstanding common stock of the company has been listed on the New York Stock Exchange.

On May 13, 1958, the stockholders of the company duly adopted the "1958 Executive Restricted Stock Option Plan of the Minnesota Mining and Manufacturing Company," hereinafter referred to as the plan. The pertinent provisions of the plan are as follows:

The Executive Restricted Stock Option Plan, adopted by the Company in 1954, afforded executives of the Company an opportunity to acquire a limited number of shares of its common stock. The Company's increased growth and diversification since the adoption of the 1954 plan have resulted in the assumption of additional responsibility by the executives who participated in that plan as well as by others who have assumed positions of key responsibility.

\* \* \* \* \* \* \*

SECTION 3.

*Shares Subject to the Plan*

The Committee from time to time may provide for Options aggregating not to exceed 200,000 shares of the common stock of Minnesota. Shares shall be made available in the discretion of the Board of Directors from authorized unissued or reacquired common stock, which latter stock is hereinafter referred to as Treasury Stock. In the event an Option granted to a Participant lapses, is cancelled or otherwise terminated, as to any or all of the shares covered by such Option, the Committee may make such shares so covered available to other Participants in accordance with the Plan.

\* \* \* \* \* \* \*

SECTION 5.

*Option, Price and Payment*

(a) Shares of common stock shall be optioned from time to time at one hundred per cent (100%) of the fair market value of such common stock on the New York Stock Exchange on the date the Option is granted. The fair market value shall be determined by the method prescribed in Section 81.10(c) of Regulation 105 issued by the United States Treasury Department.

(b) Twenty-five per cent (25%) of the total number of shares under option to a Participant may be purchased after his First Anniversary Date; an additional twenty-five per cent (25%) after his Second Anniversary Date; an additional twenty-five per cent (25%) after his Third Anniversary Date; and an additional twenty-five per cent (25%) after his Fourth Anniversary Date. This right is to be cumulative.

(c) Options not exercised during the four year period provided in the preceding paragraph may be exercised in whole or in part from time to time during the remainder of the Option Period, except that a Participant who reaches his

65th birthday during his Option Period must exercise his Option within three months after reaching his 65th birthday.

(d) In order to exercise his Option, a Participant shall give written notice to Minnesota's Treasurer at Saint Paul, Minnesota, of his intention to exercise his Option and accompany his notice with full payment for the number of shares purchased, together with a written statement that the shares are purchased by him for investment and not for resale.

(e) No shares shall be issued until full payment therefor has been made and a Participant shall obtain no rights as a stockholder until shares are issued to him.

\*　　　\*　　　\*　　　\*　　　\*　　.　·　\*　　　\*

SECTION 7.

### Delivery of Certificates

Minnesota shall not be required to issue or deliver any certificate for its common shares purchased upon the exercise of this Option prior to the admission of such shares to listing on any stock exchange on which shares may at that time be listed. In the event of the exercise of this Option with respect to any shares subject hereto, Minnesota shall make prompt application for such listing. If at any time during the Option Period Minnesota shall be advised by its counsel that the shares deliverable upon an exercise of the Option must be accompanied or preceded by a prospectus meeting the requirements of the Federal Securities Act of 1933, Minnesota will use its best efforts to provide such prospectus not later than a reasonable time following each exercise of an option, and delivery of shares by Minnesota may be deferred until such prospectus is available. The Participant shall have no interest in shares covered by this Option until certificates for said shares are issued.

On May 13, 1958, pursuant to the plan, the company and petitioner entered into an agreement. The pertinent provisions of the agreement are as follows:

OPTION PURCHASE AGREEMENT, Effective this *13th* day of *May, 1958*, by and between Minnesota Mining and Manufacturing Company, a Delaware corporation (hereinafter referred to as the "COMPANY") and G. J. BECKER, an executive employee of the COMPANY or of a Subsidiary of the COMPANY (hereinafter referred to as the "EMPLOYEE"):

#### WITNESSETH:

The COMPANY desiring to afford EMPLOYEE an opportunity to purchase shares of its Common Stock Without Par Value (hereinafter referred to as Common Stock), through the Executive Restricted Stock Option Plan, approved by the stockholders on May 13, 1958, thereby providing the EMPLOYEE with an added incentive to continue his services with the COMPANY and to intensify his interest in the success of the COMPANY.

Now, THEREFORE, In consideration of the mutual covenants hereinafter set forth and for good and valuable considerations, the parties hereto have agreed, and do hereby agree, as follows:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

#### 10. EXERCISE OF OPTION.

Subject to the terms and conditions of this Agreement, the OPTION may be exercised by written notice to the COMPANY, 900 Bush Avenue, St. Paul 6,

Minnesota, attention of the Treasurer, which notice shall state the election to exercise the OPTION and the number of shares in respect of which it is being exercised, shall fix a date (not less than five (5) business days from the date such notice is received by the COMPANY) for the delivery of the certificate or certificates for said shares, shall be accompanied by a certified or bank cashiers check for payment in full of the purchase price for said shares, shall be signed by the person or persons so exercising the OPTION * * *

### 11. PROVISION FOR LISTING AND REGISTRATION OF SHARES.

The COMPANY shall not be required to issue or deliver any certificate for its Common Shares purchased upon the exercise of this OPTION prior to registration of these shares under the Federal Securities Act of 1933 or prior to the admission of such shares to listing on any stock exchange on which shares may at that time be listed. The participant shall have no interest in shares covered by this OPTION until certificates for said shares are issued.

\* \* \* \* \* \* \*

### 15. SAVINGS CLAUSE.

If any provision contained in this Option Purchase Agreement conflicts with any provision of the Executive Restricted Stock Option Plan, the provisions of the latter shall control. * * *

The agreement was entered into for reasons connected with the employment of petitioner by the company.

By reason of the agreement petitioner became entitled to purchase all or any part of an aggregate of 200 shares of common stock of the company at $75.625 per share.

On May 13, 1958, $75.625 was equal to 100 percent of the fair market value per share of the stock so optioned.

The option granted petitioner under the agreement is an option without a readily ascertainable fair market value within the meaning of regulations section 1.421–6(d), issued pursuant to section 421, I.R.C. 1954.

On May 20, 1960, the common stock of the company was split three shares for one. By reason of that split, the number of shares optioned to petitioner became 600 shares and the option price became $25.2084 per share.

On June 2, 1960, the petitioner mailed an interoffice memorandum to the company at St. Paul, Minn., attention of the treasurer, in which he requested information on the cost and manner of payment for exercising his stock option privilege, and the existing credit in his stock option account.

The petitioner received an interoffice memorandum from the company dated June 6, 1960, and was notified that his stock option account had a credit balance of $608.37 which he was entitled to apply to the purchase of 150 shares of option stock at $25.2084 per share for a total cost of $3,781.26. Petitioner was also notified that if he wished to exercise his stock option he should complete the lower part of such memorandum and forward it to the company's treasurer at St. Paul, Minn., with a check for $3,172.89 for the balance due.

On June 14, 1960, the petitioner completed the form and placed it with a check for $3,172.89 in the company mail at the Ridgefield office addressed to the company's treasurer at St. Paul, Minn. The form stated:

Mr. I. R. HANSEN:

I hereby elect to exercise my option under the 1958 Executive Restricted Stock Option Plan and my Option Purchase Agreement for 150 shares of 3M Common Stock at $25.2084 per share.

Total cost of this purchase_____ $3,781. 26
Less deductions and interest_____     608. 37

Check enclosed for balance of_____   3,172. 89

Please deliver the certificates for this stock on <u>as soon as possible</u> and issue
in the name indicated below and forward to the following address:

GEORGE J. BECKER
986 E. GLEN AVE.
RIDGEWOOD N.J.

These shares are being purchased for investment and not for resale.

(Signed) GEORGE J. BECKER

Dated 6/14/60

No evidence was presented as to the exact date on which the form and check were received by the company's treasurer in St. Paul. The company's mail from Ridgefield, N.J., to St. Paul, Minn., goes by airmail and usually takes 1 day for delivery. Under normal circumstances, therefore, the form and check would not have been received by the company's treasurer at St. Paul, Minn., before June 15, 1960.

On June 15, 1960, the fair market value of the common stock of the company was $83 per share. On June 20, 1960, the fair market value of the common stock was $83.625 per share. Therefore, the fair market values of the 150 shares of common stock of the company on June 15, 1960, and June 20, 1960, were $12,450 and $12,543.75, respectively.

On June 20, 1960, the transaction was recorded in the accounting records of the company, and on the same day the company requested its St. Paul transfer agent to issue 150 shares of stock to petitioner.

On June 20, 1960, the transfer agent issued the stock certificate for 150 shares of stock and sent it to the First National Bank of Saint Paul, the company's registrar. The stock certificate was issued to the petitioner on or after June 20, 1960.

On June 22, 1960, the transfer agent advised the New York Stock Exchange of the foregoing transaction.

On June 27, 1960, the New York Stock Exchange authorized the First National Bank of Saint Paul to register additional shares of stock inclusive of those issued to the petitioner.

The stock used for the satisfaction of options exercised under the plan is unissued stock of the company.

On December 15, 1960, the petitioner instructed his brokers, Dominick & Dominick, to sell the 150 shares of common stock acquired under

the plan. His brokers executed the sale of such stock on the New York Stock Exchange on December 15, 1960, and confirmed the sale for delivery and settlement on December 21, 1960. Petitioner received net proceeds of $11,069.82 on December 21, 1960, from the sale.

On the petitioners' return for 1960 the sale of the 150 shares of stock of the company was reported as long-term capital gain in the amount of $7,289, taxable in the amount of $3,645, showing date acquired 6/10/60, date sold 12/15/60, gross sales price $11,163, cost $3,781, and expense of sale $93.

Petitioner did not hold the 150 shares of stock in question for more than 6 months.

OPINION

In the deficiency notice respondent determined that the 150 shares of Minnesota Mining & Manufacturing Co. stock sold by petitioner on December 15, 1960, were not held for more than 6 months and therefore the gain of $7,289.00 is reportable as a short-term capital gain. At the hearing respondent, without objection, filed an amended answer alleging that since petitioner failed to hold the stock for more than 6 months he has also failed to meet the holding period requirement of section 421(a)(1) of the 1954 Code and consequently income attributable to such disposition constitutes compensation income pursuant to section 421(b) and the applicable regulations.

It is not disputed that the holding periods of section 421(a)(1) relating to restricted stock options and section 1222 relating to long-term capital gains are the same and that their computation is governed by the same principles.

Section 421 has been amended by section 221(a), Revenue Act of 1964, with respect to options granted after 1963. We are concerned with the provisions of section 421 effective in 1960, and the related regulations, Income Tax Regs., sec. 1.421–1.[1]

---

[1] SEC. 421. EMPLOYEE STOCK OPTIONS.

(a) TREATMENT OF RESTRICTED STOCK OPTIONS.—If a share of stock is transferred to an individual pursuant to his exercise after 1949 of a restricted stock option, and no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 6 months after the transfer of such share to him—

(1) no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(f) EFFECT OF DISQUALIFYING DISPOSITION.—If a share of stock, acquired by an individual pursuant to his exercise of a restricted stock option, is disposed of by him within 2 years from the date of the granting of the option or within 6 months after the transfer of such share to him, then any increase in the income of such individual or deduction from the income of his employer corporation for the taxable year in which such exercise occurred attributable to such disposition, shall be treated as an increase in income or a deduction from income in the taxable year of such individual or of such employer corporation in which such disposition occurred.

Sec. 1.421–1 Meaning and use of certain terms.

(e) *Exercise.* For the purpose of section 421, the term "exercise", when used in reference to an option, means the act of acceptance by the optionee of the offer to sell contained in the option. In general, the time of exercise is the time when there is a sale

The respondent says that since petitioner disposed of the stock within 6 months after the transfer of the shares to him, the disposition was disqualified, pursuant to section 421(f), and any increase in income resulting from the disposition is treated as income in the year of disposition. There is no problem here as to the year, as the stock was both acquired and sold in 1960. Respondent contends that petitioner realized income measured by the difference between the amount paid for the stock and its fair market value on the date of acquisition, and that such income was compensation income. However, petitioner sold the stock for an amount less than the fair market value on the date of acquisition and, on opening statement, respondent stated it makes no difference in the computation of the deficiency whether the gain realized by petitioner is attributed to compensation income under section 421 or short-term capital gain under section 1222.[2] Accordingly, the sole issue presented is whether petitioner held the stock for more than 6 months.

It is well settled that in computing the period during which an asset was held the day upon which the asset was acquired by the taxpayer is to be excluded and the day on which it is sold is included. *Harriet M. Hooper*, 26 B.T.A. 758 (1932); *E. T. Weir*, 10 T.C. 966 (1948), affirmed per curiam 173 F. 2d 222 (C.A. 3, 1949). See also I.T. 3287, 1939–1 C.B. 138. It is also well settled that a stockholder's holding period ends on the day on which a sale is executed on a stock exchange. *Dee Furey Mott*, 35 B.T.A. 195 (1936), affirmed per curiam 103 F. 2d 1009. See also I.T. 3705, 1945 C.B. 174. The petitioner sold the stock through the New York Stock Exchange on December 15, 1960. Such date is the last day of his holding period for purposes of the computation. The question remaining is to find the date on which the holding period began.

If petitioner acquired the stock on June 14, his holding period began June 15 and ended December 15 and was more than 6 months. If he

---

or a contract to sell between the corporation and the individual. An agreement or undertaking by the employee to make payments under a stock purchase plan does not constitute the exercise of an option so long as the payments made remain subject to withdrawal by the employee.

(f) *Transfer*. For the purpose of section 421, the term "transfer", when used in reference to the transfer to an individual of a share of stock pursuant to his exercise of a restricted stock option, means the transfer of ownership of such share, or the transfer of substantially all the rights of ownership. Such transfer must, within a reasonable time, be evidenced on the books of the corporation.

[2] SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.

For purposes of this subtitle—

(1) SHORT-TERM CAPITAL GAIN.—The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income.

\* \* \* \* \* \* \*

(3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

acquired it on June 15, his holding period began on June 16 and ended on December 15, and was not more than 6 months. The petitioner, who has the burden of proof, must show that he acquired the stock on June 14, or earlier.

In *George W. S. Swenson*, 37 T.C. 124 (1961), the taxpayer, also an employee of Minnesota Mining & Manufacturing Co., acquired stock of the company under a stock option plan adopted in 1954, the provisions of which were similar to those of the plan of 1958 here involved. He executed an instrument to exercise his option and delivered it with his check to the company at St. Paul on January 10, 1957. The company, on January 14, directed its transfer agent to issue the stock. The certificate was dated and issued January 16. The taxpayer sold some of his shares on July 16 of the same year. In view of provisions of the plan and option to the effect that the participant shall obtain no rights as a stockholder and shall have no interest in the shares covered by the option until the certificates were issued, we held that the taxpayer's holding period of the shares sold began on January 16, when the shares were issued to him, and was not more than 6 months. The Court of Appeals for the Eighth Circuit reversed, 309 F. 2d 672 (1962), holding that the taxpayer, by the exercise of his option and payment, acquired a contractual interest in the stock prior to January 16, and that his holding period commenced prior to January 16. The court ruled that "the holding period of corporate stock begins or ends when a purchaser acquires substantial contractual rights which will ripen into full ownership unless defeated by a breach of contract by the other contracting party" (pp. 673–674).

Petitioner here contends, first, that he exercised his stock option on June 2, when he wrote the company that he would like to exercise his option. He asked then the cost and manner of payment and the amount of the credit available to him. He argues that this was an offer to buy the shares available to him under the company's offer in the option purchase agreement, and was in substance a contract for that purchase.

This was merely an inquiry and did not comply with the method for exercising his option provided in section 5(d) of the plan and section 10 of the agreement. After receiving the reply he could have refrained from sending the election form furnished with the reply, and was under no obligation to send a check. There was no purchase or binding agreement effected at this time. This was not an exercise of his option.

Next, petitioner says that when he signed his check and the election form on June 14 and deposited them in the company mail, this constituted an election effective on that date just as if he had deposited it in the company mail at St. Paul, the home office. He maintains that the branch offices, which have authority to accept payments of accounts,

are extensions of the home office, and deposit in the mail at the branch is notice to the company.

According to the petitioner's own testimony, the check and election to exercise the option, if deposited in the company mail at Ridgefield on June 14, would not be received at the home office in St. Paul until June 15.

The plan provides that the option shall be exercised by giving "written notice to Minnesota's Treasurer at Saint Paul, Minnesota, of his intention to exercise his Option." The agreement provides that the option "may be exercised by written notice to the COMPANY, 900 Bush Ave., St. Paul 6, Minnesota, attention of the Treasurer." Obviously, until the treasurer at St. Paul received the notice he had no authority to direct the issuance of the stock to petitioner. The company, on June 14, could not know that petitioner was electing to exercise his option or how many shares he chose to acquire. The deposit of the election form in the company mail at Ridgefield was not such an effective exercise of the option as would justify the conclusion that petitioner "acquired" the stock on that day. Ordinarily, a notice to exercise an option is effective only upon its receipt by the party to be notified. Cf. *Scott-Burr Stores Corp.* v. *Wilcox*, 194 F. 2d 989 (C.A. 5, 1952). We cannot say that the petitioner, on June 14, had acquired "substantial contractual rights" before the company or its treasurer had received the notice. Certainly there was no appropriation of stock to his contract on June 14. This plan does not provide that the option may be exercised by the mailing of a written notice, as in *Estate of James S. Ogsbury*, 28 T.C. 93 (1957), affd. 258 F. 2d 294 (C.A. 2, 1958).

As mentioned above, the Court of Appeals in *Swenson* v. *Commissioner*, *supra*, held that the taxpayer acquired a contractual interest in the stock prior to January 16, the date the certificate of stock was issued. The court did not go so far as to say that such an interest was acquired on January 10, the date the notice of election to exercise the option was served on the company, or on January 14, the date the company directed its transfer agent to issue the stock. Such a precise determination was not necessary in that case. In the present case the election was received by the company, at the earliest, on June 15. Assuming that it was received on that date, and assuming, without deciding, that petitioner acquired substantial contractual rights on that date, petitioner's holding period began on June 16 and ended on December 15, and was not more than 6 months.

Petitioner also contends that section 1223(6) applied and requires a finding that the date of exercise of his right, June 15, rather than the next day following, is within his holding period. This section provides:

(6) In determining the period for which the taxpayer has held stock or securities acquired from a corporation by the exercise of rights to acquire such stock or securities, there shall be included only the period beginning with the date on which the right to acquire was exercised.

In *E. T. Weir, supra*, it was held that the predecessor of this statute applied only to rights arising out of stock ownership, not to stock acquired by option. So far as we are aware no court has held otherwise. The Eighth Circuit Court of Appeals, in *Swenson* v. *Commissioner, supra* (see fn. 2), because of its finding in favor of the taxpayer on other grounds, found it unnecessary to interpret section 1223(6). See also 3 B Mertens, Law of Federal Income Taxation, sec. 22.111; and *Milliken* v. *Commissioner*, 196 F. 2d 135, 138 fn. 3 (C.A. 2, 1952).

We conclude that petitioner did not hold the stock for more than 6 months.

*Decision will be entered for the respondent.*