JOHN H. ROLFS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MAXWELL A. ARNOLD, JR., AND PATRICIA ARNOLD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5618–70, 5708–70. Filed May 22, 1972.

*Walter G. Schwartz*, for the petitioners.
*Lawrence G. Becker*, for the respondent.

OPINION

TIETJENS, *Judge:* In these consolidated cases the Commissioner determined deficiencies in the income tax of petitioners herein as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| John H. Rolfs | 5618–70 | 1965 | $2,375.00 |
| Maxwell A. Arnold, Jr., and Patricia Arnold | 5708–70 | 1965 | 4,452.13 |

John H. Rolfs filed an individual Federal income tax return for 1965 with the district director of internal revenue in San Francisco, Calif. He resided in Sausalito, Calif., at the time of filing the petition herein. Maxwell A. Arnold, Jr., and Patricia Arnold have at all pertinent times been husband and wife residing at Menlo Park, Calif. They filed

a joint Federal income tax return for 1965 with the district director in San Francisco. Patricia Arnold is a party because she signed the joint return. Any reference to "petitioners" hereafter will refer to John Rolfs and Maxwell Arnold only.

The facts are fully stipulated and submitted with joint exhibits, and the legal issues are the same in both dockets. The Commissioner's sole determination in each is that petitioners should have included as compensation the amounts realized upon the sale of stock they had previously acquired through the exercise of statutory restricted stock options. The petitioners reported the amounts as long-term capital gain in their respective returns, and they challenge the entire deficiencies. The issue is whether the shares were transferred to petitioners more than 6 months before petitioners disposed of them by sale.

Petitioners' common employer, Guild, Bascom & Bonfigli, Inc. (GB&B), an advertising agency incorporated in California, established on July 23, 1963, effective July 1, 1963, a restricted stock option plan called the 1963 Employees' Stock Purchase Plan. The objective of the plan was to permit employees who had completed a minimum of 1 year of service to become shareholders or to increase their shareholdings as the case may be, and the petitioners, both of whom worked for GB&B since the early 1950's, were eligible to participate.

Letters dated July 22, 1963, were sent to eligible employees informing them of the stock options granted pursuant to the plan. Originally the options had to be exercised before December 31, 1963, but the deadline was extended, and petitioners timely exercised their respective options on April 30, 1964. The option price was $81 per share, a figure which equaled the fair market value of the stock on the date the options were granted. Each employee was entitled under the 1963 plan to purchase up to 200 shares, and was required to designate the number of whole shares desired when he exercised the option. On the date of exercise, Rolfs executed a promissory note pursuant to one of several acceptable means of payment, for the price of 95 shares plus 4-percent interest. Arnold gave a note for the purchase of 200 shares the same day. Under the plan cash payment had to be completed or a promissory note taken up no later than June 30, 1965, and on that date Arnold paid $16,200 with interest and thereupon received a certificate for 200 shares of GB&B stock bearing that date. Rolfs tendered $7,695 with interest in satisfaction of his note on the previous May 1, 1965, and received a certificate dated April 30, 1965.

Taking into account the facts already recited, the fact that petitioners did not individually own more than 10 percent of the GB&B voting stock on the option date of grant, and the fact that under the terms of the plan the options themselves were nontransferable, there is no

doubt that the options exercised by the petitioners were "restricted stock options" within the meaning of section 424(b), I.R.C. 1954.[1] Also, of the three sections describing qualified stock options, sections 422–424, only section 424 could apply in view of the pre-1964 vintage of the GB&B plan.

Late in August 1965, GB&B, acting as agent for the shareholders through its three senior partners, commenced negotiations with the Delaware corporation Dancer-Fitzgerald-Sample, Inc., for the cash purchase of all the outstanding GB&B common stock. An understanding was reached and all the GB&B stockholders sold their entire holdings for an agreed price of $181 per share. Accordingly, Rolfs realized $17,195 and Arnold realized $36,200 on the stock they had acquired originally through the 1963 stock purchase plan.

This case is not one to be decided under the case law concerning nonstatutory stock options such as those dealt with in *Commissioner* v. *LoBue*, 351 U.S. 243 (1956). The Commissioner does not argue that petitioners received compensation from GB&B at the time they exercised the options, although this would have been the case if the requirements of section 424 (a) or (b) had not been satisfied generally. Sec. 421(a). However, section 421(b) specifically provides *inter alia* that failure to satisfy section 424(a) solely because of any of the holding-period requirements of section 424(a)(1) will cause the optionee to realize income in the year the stock was disposed of.[2] The term "disposition" is defined by section 425(c) and embraces the sale herein.

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

[2] The pertinent parts of the two interacting sections are as follow:

SEC. 424. RESTRICTED STOCK OPTIONS.

(a) IN GENERAL.—Section 421(a) shall apply with respect to the transfer of a share of stock to an individual pursuant to his exercise after 1949 of a restricted stock option, if—

(1) no disposition of such share is made by him within 2 years from the date of granting of the option nor within 6 months after the transfer of such share to him, * * *

SEC. 421. GENERAL RULES.

(a) EFFECT OF QUALIFYING TRANSFER.—If a share of stock is transferred to an individual in a transfer in respect of which the requirements of section 422(a), 423(a), or 424(a) are met—

(1) except as provided in section 422(c)(1), no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;

*        *        *        *        *        *        *

(b) EFFECT OF DISQUALIFYING DISPOSITION.—If the transfer of a share of stock to an individual pursuant to his exercise of an option would otherwise meet the requirements of section 422(a), 423(a), or 424(a) except that there is a failure to meet any of the holding period requirements of section 422(a)(1), 423(a)(1), or 424(a)(1), then any increase in the income of such individual or deduction from the income of his employer corporation for the taxable year in which such exercise occurred attributable to such disposition, shall be treated as an increase in income or a deduction from income in the taxable year of such individual or of such employer corporation in which such disposition occurred.

The parties do not dispute that the date of the sale of all the GB&B stock by its shareholders was October 14, 1965. Since the date of the granting of the options was July 1, 1963, petitioners satisfied the first prong of section 424(a)(1) because the disposition of their stock occurred later than 2 years after that date. The parties do disagree as to the exact date on which the shares were transferred to petitioners for purposes of the ensuing statutory language "nor within 6 months after the transfer of such share." To compute the period during which the petitioners actually held the stock, we include the day on which the stock was sold and exclude the day on which it was transferred to them. *E. T. Weir*, 10 T.C. 996 (1948), affirmed per curiam 173 F. 2d 222 (C.A. 3, 1949); *Harriet M. Hooper*, 26 B.T.A. 758 (1932). Reckoning backwards from the date of disposition, it follows that the date of transfer to petitioners must have fallen on or before April 13, 1965, if they are to be entitled to favorable capital gains treatment. Petitioners bear the burden of proving that the transfer occurred as early as that. *George J. Becker*, 46 T.C. 613, 620 (1966), reversed on another ground 378 F. 2d 767 (C.A. 3, 1967); Rule 32, Tax Court Rules of Practice.

Although there is no definition of the term "transfer" in the statute, section 1.421–1(f), Income Tax Regs.,[3] which was cited in the closely analogous case *Swenson* v. *Commissioner*, 309 F. 2d 672, 674 (C.A. 8, 1962), reversing 37 T.C. 124 (1961), supplies one. We think we will be following the law as it now stands if we simply apply the regulation, the language of which demands only "transfer of ownership" or "transfer of substantially all the rights of ownership."[4] In this connection we further note that since our reversal in *Swenson* we have abandoned the contention we made in that case that the time of oc-

---

[3] Sec. 1.421–1(f), Income Tax Regs., provides:

(f) *Transfer*. For the purpose of section 421, the term "transfer", when used in reference to the transfer to an individual of a share of stock pursuant to his exercise of a restricted stock option, means the transfer of ownership of such share, or the transfer of substantially all the rights of ownership. Such transfer must, within a reasonable time, be evidenced on the books of the corporation.

[4] In *Swenson*, the Eighth Circuit also adverted to the potentially more restrictive test that this Court had announced in the same case and that marks the holding period from the moment the purchaser acquires substantial contractual rights which will ripen into full ownership unless defeated by the earlier breach of the other contracting party. We have found that in referring to the opinion of the Court of Appeals we have not always formulated the holding therein in the same way. In *George J. Becker*, 46 T.C. at 620, we said: "The court ruled that 'the holding period of corporate stock begins or ends when a purchaser acquires substantial contractual rights which will ripen into full ownership unless defeated by a breach of contract by the other contracting party' [309 F. 2d at] 673–674." In *Joseph P. Pike*, 44 T.C. 787 (1965), we quoted other language from the opinion of the Court of Appeals: "The court held 'that the taxpayer, by the exercise of his option in strict accordance with its terms and the payment of the full purchase price, acquired a substantial contractual interest in the stock prior to January 16.' 309 F. 2d at

currence of the transfer is a question of State contract law. See *Ted F. Merrill*, 40 T.C. 66, 77 (1963), affirmed per curiam 336 F. 2d 771 (C.A. 9, 1964).

Petitioners must show that at least they possessed substantially all the rights of ownership of the optioned stock on or before April 13, 1965, the last day on which a holding period of 6 months could have begun. The Commissioner contends that various express conditions in the stock purchase plan in effect postponed the transfer date until after April 13, 1965. We are persuaded by the provisions of the plan calling for cash payment by the June 30, 1965, deadline as a condition of the issuance of shares. Evidently the parties considered it a major condition respecting GB&B's duty to perform. That being the case, we cannot conclude that transfer of substantially all the rights of ownership occurred at any time before petitioners made cash payment. As petitioners did not take up their promissory notes until after April 13, 1965, it follows that the Commissioner must prevail.

We do not think that the contracting parties intended that the mere giving of promissory notes would substitute for cash payment. Tender of the notes neither entitled petitioners to immediate delivery of the shares nor extended their deadline for eventual cash payment.[5]

Petitioners contend that section 1223 (6)[6] may have some relevance. However, it is settled that when a disqualifying disposition for purposes of section 421 (b) has occurred, section 1223 (6) does not demand long-term capital gains treatment of the amount realized. *George J. Becker, supra* at 622. See also *E. T. Weir, supra* at 1000.

The precise amount of income petitioners realized is not an issue for our redetermination, but we note the parties' agreement, evidently for purposes of sections 1.421–5 (e) and 1.421–6 (d), Income Tax Regs., that the stock options did not have a readily ascertainable fair market value at the time they were granted.

*Decisions will be entered for the respondent.*

---

676." 44 T.C. at 797. (We do not have to decide here whether to follow the reversal in *Swenson*. In that case actual payment for stock had been made before the crucial date. Here no such payment was made until the petitioners took up their notes.)

[5] Petitioners argue that the transfer occurred as early as the date the options were exercised, which we have determined to be Apr. 30, 1964. The opinion of the Third Circuit reversing our decision in *Becker* supports in a superficial way the contention that the relevant date for our purposes is the date of exercise, since the Court of Appeals stated that the taxpayer "acquired" stock when his acceptance of the option became binding on the employer. 378 F. 2d at 769. However, in that case, unlike ours, the employee was required to pay for the stock in full when he exercised the option.

[6] Sec. 1223 (6) provides:

(6) In determining the period for which the taxpayer has held stock or securities acquired from a corporation by the exercise of rights to acquire such stock or securities, there shall be included only the period beginning with the date on which the right to acquire was exercised.